**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| FICEP CORPORATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 19-1994-RGA |
| ) | |
| PEDDINGHAUS CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**REPORT AND RECOMMENDATION**

In this patent action filed by Plaintiff Ficep Corporation ("Ficep" or "Plaintiff") against Defendant Peddinghaus Corporation ("Peddinghaus" or "Defendant"), presently pending before the Court is Peddinghaus's motion to dismiss Ficep's operative First Amended Complaint ("FAC"), filed pursuant to Federal Rule of Civil Procedure 12(b)(6) (the "Motion"). (D.I. 15) For the reasons set forth below, the Court recommends that the Motion be DENIED.

**I.    BACKGROUND**

   **A.    Factual Background**

In the FAC, Ficep accuses Peddinghaus's CNC ("computer numerical control") machine products and predecessors thereto, as well as third party 3D modeling software and Peddinghaus's Raptor software (and predecessor software) that is used with Peddinghaus's CNC machines, of infringing at least claims 1, 7 and 14 of Ficep's United States Patent No. 7,974,719 (the "'719 patent"). (D.I. 13 (hereinafter, "FAC") at ¶¶ 9-38) The '719 patent is entitled "Method and an Apparatus for Automatic Manufacture of an Object with Multiple Intersecting

Components," and generally speaking, it relates to systems and methods for the manufacture of construction components. (*Id*. at ¶ 6 & ex. A)[1]

Further relevant facts related to resolution of the Motion will be set out as needed in Section III.

### B. Procedural Background

Ficep filed the instant action on October 21, 2019, (D.I. 1), and the FAC on June 18, 2020, (D.I. 13). The instant Motion was filed on July 9, 2020. (D.I. 15) United States District Judge Richard G. Andrews referred the Motion to the Court for resolution on August 17, 2020. (D.I. 22) Briefing on the Motion was completed on August 13, 2020, (D.I. 20), and the Court held a hearing on the Motion via videoconference on December 3, 2020, (D.I. 28 (hereinafter, "Tr.")).

## II. LEGAL STANDARD

With the instant Motion, Peddinghaus asserts that the claims of the '719 patent are directed to patent-ineligible subject matter, pursuant to 35 U.S.C. § 101 ("Section 101"). The Court has often set out the relevant legal standards for review of such a motion, including in *Genedics, LLC v. Meta Co.*, Civil Action No. 17-1062-CJB, 2018 WL 3991474, at *2-5 (D. Del. Aug. 21, 2018). The Court hereby incorporates by reference its discussion in *Genedics* of these legal standards and will follow those standards herein. To the extent consideration of Peddinghaus's Motion necessitates discussion of other, related legal principles, the Court will set out those principles in Section III below.

## III. DISCUSSION

---

[1]  The '719 patent is attached as Exhibit A to the FAC. Further citations will simply be to the "'719 patent."

2

With its Motion, Peddinghaus asserts that claim 7 of the '719 patent is representative for Section 101 purposes. (D.I. 16 at 3; D.I. 20 at 3-4) Thus, the Court will focus below on claim 7, understanding that if the Motion is not well taken as to that claim, the Motion will also not be successful as to the remaining asserted claims in the case. Claim 7 recites the following:

> **7.** An apparatus for automatic manufacture of an object, comprising:
>
> a computing device adapted to create a design model of an object having multiple individual components, at least two of the individual components defining an intersection at which the two components are in contact with one another;
>
> at least one programmable logic controller in communication with the computing device and with at least one manufacturing machine;
>
> a receiver associated with the programmable logic controller for receiving the design model of the object;
>
> a database unit adapted to store the design model received at the receiver;
>
> a processor which is associated with the programmable logic controller and extracts from the design model a plurality of dimensions of components which define a plurality of components of the object;
>
> wherein the processor identifies a plurality of intersection parameters which define the intersection of the two components;
>
> wherein the processor extracts from the design model the intersection parameters;
>
> a transmitter associated with the processor for transmitting the intersection and machining parameters and the component dimensions from the programmable logic controller to the at least one manufacturing machine; and
>
> wherein the at least one manufacturing machine manufactures the components based at least in part on the transmitted component dimensions and on the transmitted intersection and manufacturing parameters.

('719 patent, col. 8:25-55)

### A.     *Alice*'s Step One

*Alice*'s step one asks whether the claim at issue is "directed to" an abstract idea. In order to assess this question, the United States Court of Appeals for the Federal Circuit has instructed that courts should look to whether the claim at issue "focus[es] on a specific means or method that improves the relevant technology or [is] instead directed to a result or effect that itself is the abstract idea and merely invoke[s] generic processes and machinery." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020) (quoting *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016)); *see also EcoServs., LLC v. Certified Aviation Servs., LLC*, 830 F. App'x 634, 642 (Fed. Cir. 2020). An "abstract idea" is a "'disembodied' concept . . . a basic building block of human ingenuity, untethered from any real-world application." *CLS Bank Int'l v. Alice Corp. Pty. Ltd.*, 717 F.3d 1269, 1286 (Fed. Cir. 2013) (Lourie, J., concurring) (citation omitted).

The '719 patent claims systems and methods for the automatic manufacture of a physical object with multiple intersecting components. ('719 patent at Abstract & cols. 1:66-2:2) In light of that, as the Court approaches *Alice*'s step one, it is worth taking a step back to understand what relevant controlling law tells us about how such claims can survive that step.

On the one hand, if a claim simply takes an abstract idea (say, something that humans have done for a long time) and does nothing more than make use of a generic computer to perform the abstract idea faster or more accurately than a human could (the type of "conventional" function that any computer can make happen), then the claim is ineligible. *McRO*, 837 F.3d at 1314 (noting that "claims [that] simply use a computer as a tool to automate conventional activity" are patent ineligible); *see also OIP Techs., Inc. v. Amazon.com, Inc.*, 788

4

F.3d 1359, 1363 (Fed. Cir. 2015). That would be the type of "do it faster (or more accurately) on a computer" kind of claim that *Alice* and its progeny have warned against. After all, the eligibility analysis is focused on preemption concerns. *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014) ("We have described the concern that drives [the Section 101 analysis] as one of pre-emption.") And according to the Supreme Court of the United States, with respect to the kind of claims described above, the "add" of the computer and its processing capability simply does not change the preemption calculus in a material way. *Id.* at 223-25 (noting that if a patent's "recitation of a computer amounts to a mere instruction to implemen[t] an abstract idea on . . . a computer . . . that addition cannot impart patent eligibility" because "[g]iven the ubiquity of computers, . . . wholly generic computer implementation" or use of the computer to "perform generic computer functions" is not the type of "additional featur[e] that provides any practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself") (internal quotation marks and citations omitted). Put another way, if that type of claim, absent the addition of the computer, would have walled off anyone from being able to make/use/sell/offer for sale a system or method that amounts to an abstract idea, then even after the addition of the computer, the claim would have just about the same breadth.

But on the other hand, some inventions that "automate tasks that humans are capable of performing are patent eligible if properly claimed[.]" *McRO*, 837 F.3d at 1313; *see also, e.g.*, *EcoServs., LLC*, 830 F. App'x at 643 ("That the claimed system achieves automation of a task previously performed by humans, however, does not mean the claimed system is necessarily directed to an abstract idea."). In *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299 (Fed. Cir. 2016), for example, the Federal Circuit held that patents relating to the automation of part of a preexisting 3-D animation method were patent-eligible subject matter under Section

5

101, where the claims were focused on a "specific asserted improvement" in computer animation and there was "no evidence that the process previously used by animators is the same as the process required by the claims."  837 F.3d at 1303, 1314; *see also, e.g.*, *Axcess Int'l, Inc. v. Genetec (USA) Inc.*, 375 F. Supp. 3d 533, 537 (D. Del. 2019) ("Methods with real-world impact, implemented on physical devices, are not rendered abstract merely by the ability of a human to achieve a similar result (e.g. keeping watch) via different means.").  The way that the Court understands the law in this area is that in cases like *McRO*, the Federal Circuit has found claims patent eligible at step one not simply because those claims were *novel*—i.e., because they added the element of computer automation (a new element) to a prior human process that amounted to an abstract idea.  Instead, the Court understands the cases to be saying that the more that a patent is claiming something that amounts to a *specific improvement* to computer technology, the greater the likelihood that we are dealing with claims directed to a *specific, particularized real-world application* of the purported abstract idea, not simply to the abstract idea itself.[2]  Avoiding

---

2   *See CardioNet, LLC*, 955 F.3d at 1366, 1368 (concluding at step one that the claims were not directed to the "abstract idea that atrial fibrillation and atrial flutter can be distinguished by focusing on the variability of the irregular heartbeat" but to "an improved cardiac monitoring device" because the claims' focus was "on a *specific* means or method that *improves* cardiac monitoring technology" and not to "a result or effect that itself is the abstract idea" and looking to the written description to aid in that conclusion) (internal quotation marks and citation omitted, emphasis added); *EcoServs., LLC*, 830 F. App'x at 642 (concluding at step one that the claims at issue were not directed to an abstract idea, because "the claims are directed to a *specific system* that *improves* jet engine washing [and not to] a 'result or effect that itself is the abstract idea' of, e.g., automated jet engine washing" and because the claims "do not recite the mere desired result of automated jet engine washing, but rather recite a *specific solution* for accomplishing that goal") (internal quotation marks omitted, emphasis added); *McRO*, 837 F.3d at 1313-15 (concluding the same at step one, the claims were not directed to the abstract idea of "automated rules-based use of morph targets and delta sets for lip-synchronized three-dimensional animation" because in the claims, the "computer . . . is employed to perform a *distinct* process to automate a task previously performed by humans" and the "claimed process uses a combined order of *specific* rules that renders information into a *specific* format that is then used and applied to create desired results" and the "*specific* structure of the claimed rules would prevent broad preemption of all rules-based means of automating lip synchronization [as there

a Section 101 rejection at step one, then, is not just about showing that your computer-automated claim is new or novel; it is also about showing that this newness or novelty helps explain why your claim more *specific, more distinct, more narrow or more particularized* than the asserted abstract idea itself (i.e., the thing that your opponent says the claim is really "directed to"). *CardioNet, LLC*, 955 F.3d at 1372 ("The analysis under Alice step one is whether the claims as a whole are 'directed to' an abstract idea, regardless of whether the prior art demonstrates that the idea or other aspects of the claim are known, unknown, conventional, unconventional, routine, or not routine."). That is why this type of Section 101 analysis (which is ultimately about abstractness vs. real world application) is different than a Section 102 or Section 103 analysis (which is ultimately about novelty vs. what was known, or about obviousness vs. nonobviousness).

With all that said, the Court turns back to claim 7. According to Peddinghaus, this claim is directed to the abstract idea of "identifying, extracting, and transferring data from a design file for the purpose of manufacturing an object[.]" (D.I. 16 at 7, 14; D.I. 20 at 4) Peddinghaus asserts that the claims merely take a known prior art process that had been manually performed by humans and then add "generic computer components[.]" (D.I. 16 at 7-8) In other words, Peddinghaus argues that the only claimed advance in claim 7 is that the steps of identifying and extracting design parameters from the design model and entering that information into the manufacturing machine—steps previously performed by a human—would now be performed automatically, in just the same way, by generic computing equipment. (*Id.* at 8-10; *see also* D.I. 20 at 6 ("[T]he '719 patent's specification and claims require only conventional computer

---

was no showing that] the limits of the rules themselves are broad enough to cover all possible approaches") (internal quotation marks and citation omitted, emphasis added).

equipment and manufacturing machines, and the claims encompass achieving the result by the same means used by human operators."); Tr. at 22-23, 78-80)  To Peddinghaus, "[t]he only thing that the patent says is that the computer does [the asserted abstract idea embedded in the claims] faster [and] perhaps does it more accurately" than the "human operator" would.  (Tr. at 79)

In assessing Peddinghaus' argument, the Court starts at the beginning of the step one inquiry, and asks:  Is "identifying, extracting, and transferring data from a design file for the purpose of manufacturing an object" an abstract idea in the first place?  Ficep does not claim that this is *not* an abstract idea.  And so the Court will assume herein that it is, for purposes of resolving the Motion.  *Cf. Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1368 (Fed. Cir. 2019) ("We hold at *Alice* step one that representative claim 1 is directed to the abstract idea of 'collecting, analyzing, manipulating, and displaying data.'")

Next, the Court asks:  Is claim 7 *directed to* this abstract idea?  Before trying to answer that question, it is helpful to review the patent's "Background of the Invention" and "Objects of the Invention" sections, which are found in columns 1 and 2 of the patent specification.

The "Background of the Invention" section explains that computer-aided design ("CAD") programs and systems can be utilized to design three-dimensional models of physical objects, including structural or mechanical parts of a structure or device.  ('719 patent, col. 1:14-17)  CAD allows for the display of that three-dimensional scale model on a computer or for the printing of that model as a schematic diagram.  (*Id.*, col. 1:17-20)  A CAD model generally includes design specifications such as welding characteristics, names of parts and components and dimensional references for squaring.  (*Id.*, col. 1:20-25)

The specification indicates that prior to the patented invention, in order to complete the manufacturing process of a structure or device based on a CAD model, a human operator

typically had to manually program the manufacturing machines associated with an assembly line. (*Id.*, col. 1:26-30)  To accomplish this, the human operator would first review the CAD information that was visually produced on the computer display, and then input the CAD design specifications into the automated assembly line apparatus.  (*Id.*, col. 1:32-41)

The specification then recognizes that there was a need to improve this process.  (*Id.*, col. 1:43-49)  One difficulty with the prior art process was that sometimes, when you needed the specialized human operator to be inputting data into the manufacturing machine, that person was simply unavailable.  (*Id.*, col. 1:37-43)  Thus, the inventors recognized that "there is a direct need to improve the way in which the design parameters for all the components of an object, for example positions, welding codes, references for squaring and so forth, are provided to a manufacturing machine, while maintaining compatibility with [CAD] programs."  (*Id.*, col. 1:43-49)  The specification then states: "[t]o increase efficiency, design parameters related to intersections and points of contact or connection between components that come into contact with other components are included as design parameters."  (*Id.*, col. 1:49-53)  And then the patent goes on to discuss another problem with prior art solutions:  that sometimes, the human manually inputting the CAD information would make mistakes.  The patent says that the inventors thus sought to eliminate the possibility of "operator error" when providing instructions to the manufacturing machine.  (*Id.*, col. 1:53-55)  The claimed "robust solution[,]" which enabled manual marking-out operations to be performed automatically, would "improve[] efficiency and accuracy and lower[] cost[s]" relating to manufacturing objects, "since manual marking-out operations can be performed automatically."  (*Id.*, col. 1:55-58)

The "Objects of the Invention" section then follows up by explaining that:  "the aim of the present invention is to overcome these and other problems by providing systems and methods

9

related to automated manufacture of an object with multiple intersecting components. To increase efficiency and reduce cost, the systems and methods of the present invention may be based on information included as part of existing computer-aided designs." (*Id.*, cols. 1:66-2:5)

The Court now turns back to the step one analysis. One of Ficep's key arguments about why claim 7 is not directed to the abstract idea at issue is that there is something about the novelty of the invention (i.e., how the invention is different from the prior art process that involved humans) that also makes a difference at step one of the eligibility analysis. So what does Ficep say that is? Here, Ficep points primarily to the following claim limitation: "wherein the processor identifies a plurality of intersection parameters which define the intersection of the two components" ("the identifying limitation" or the "identifying step"). Ficep argues that with this limitation, claim 7's apparatus "creat[es] new information about intersection parameters that was not included in the design model at the time" of the invention. (D.I. 19 at 8-9 & n.1 (emphasis added)) That is, Ficep argues that the programmable logic controller in claim 7 is "going to identify and extract [] information" about intersection parameters from the CAD files by "using calculations on a computer" in a manner different from how humans identified intersection parameters before the time of the invention. (Tr. at 44, 64; *see also* D.I. 19 at 2, 8-9 & n.1; Tr. at 40, 43-48, 71-72; Ficep's Oral Argument Hearing Presentation, Slide 25)

As the Court will explain below, there is some support for Ficep's position in the record.[3] But although the parties largely address this issue in their briefs as part of a step one analysis,

---

[3] Below, the Court will explain why Ficep's position will ultimately prevail as to this Motion. But that is not to say that the "Background of the Invention" and "Objects of the Invention" sections of the patent do not provide Peddinghaus with good material to work with from a Section 101 perspective. Much of the content of columns 1 and 2 of the patent, summarized above, really *does* seem to read as if the patent is saying that its claims are focused on (1) taking a previously-existing human process (i.e., manually programming design parameters into manufacturing machines associated with an assembly line) and (2) simply

(*see, e.g.*, D.I. 16 at 9-10; D.I. 19 at 9-11; D.I. 20 at 7-8), in the Court's view, it is better assessed at step two. That is because "*Alice* step one presents a legal question that can be [and almost always is] answered based on the intrinsic evidence[,]" i.e., an analysis that "beg[ins] and end[s] with the patent itself[,]" including "the plain claim language, written description, and prosecution history[.]" *CardioNet, LLC*, 955 F.3d at 1372-73. In other words, if the Court were looking at this issue as a step one question, it would typically do the following:

(1) It would note that the abstract idea at issue is "identifying, extracting, and transferring data from a design file for the purpose of manufacturing an object";

(2) It would also note that Ficep's position is that the identifying step in claim 7 (i.e., "wherein the processor identifies a plurality of intersection parameters which define the intersection of the two components") is meant to get to something that is more particularized than what is captured by the asserted abstract idea (i.e., "identifying . . . data");

(3) It would then have to assess whether the inclusion of that amount of asserted extra-abstract-idea particularity is enough to consider claim 7 to be "directed to" something other than the abstract idea;

(4) But in doing so, it would typically only be considering the patent's text or prosecution history, and it would be making a legal determination about what the "focus" of the claim really is;

(5) And in doing that, it would not typically be considering extrinsic evidence that might help demonstrate the import of this aspect of the identifying step.

Here, that kind of step one inquiry would be difficult for Ficep, in part because the '719 patent itself does not really have a lot to say about intersection parameters, nor about why the

---

automating that process via a computer, so that it can be done more accurately. (Tr. at 5-7) That said, as is set forth below in the Court's *Alice* step two analysis, there is an aspect of the claims (the identifying step's use of intersection parameters) that, at least for now, prompts the Court's recommendation that the Motion be denied.

11

identifying step in claim 7 helps demonstrate that the claim is not directed to an abstract idea. (Tr. at 48-49) Instead, some of Ficep's best evidence about the identifying step comes from outside the patent (i.e., from the FAC). Thus, the Court concludes that the issue is best addressed at step two.

Therefore, the Court will assume *arguendo* that claim 7 is directed to the abstract idea at issue, and move on to consider the eligibility question at step two. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) (recognizing that in some cases "involving computer-related claims, there may be close calls about how to characterize what the claims are directed to"; in such cases, "an analysis of whether there are arguably concrete improvements in the recited computer technology [may] take place under step two").

## B. *Alice*'s Step Two

If a claim is directed to an abstract idea, then step two of the *Alice* framework requires a court to assess "[w]hat else is there in the claims" by considering the "elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Alice*, 573 U.S. at 217 (certain internal quotation marks and citations omitted). The Supreme Court describes step two as a search for an "inventive concept[.]" *Id.*; *see also Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). And with regard to computer-related claims, the Supreme Court has noted that if a patentee argues that an aspect of the claim amounts to an inventive concept, but that aspect simply amounts to the use of "computer implementation" that is "purely conventional" or that amounts to invoking "the most basic functions of a computer" then this add will not serve the render the claim patent eligible. *Alice*, 573 U.S. at 222, 225.

As with step one, step two is focused on preemption, not novelty. Although the Supreme Court used the term "inventive concept" to describe what it is that helps a patentee survive step two, the search for an inventive concept is not about whether the claim element in question is new or unique. *See Affinity Labs. of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1263 n.3 (Fed. Cir. 2016). After all, an "inventive concept" is simply "an element or combination of elements that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself." *Alice*, 573 U.S. at 217-18 (certain internal quotation marks and citations omitted). In the context of computer-focused claims, the addition of an element that simply requires a computer to work in its "conventional" manner (i.e., to speed up the processing of an abstract idea) cannot amount to an inventive concept. But the addition of elements that amount to the "unconventional" use of computer technology might be enough. That is because the inclusion of such elements might help demonstrate how the claim is *sufficiently particularized* so as to not to be, essentially, *a claim to the abstract idea itself*. *See Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1306 (Fed. Cir. 2016) (finding that the claims recited an inventive concept where "they describe a specific, unconventional technological solution, narrowly drawn to withstand preemption concerns, to a technological problem"); *Fitbit, Inc. v. AliphCom*, 233 F. Supp. 3d 799, 812-13 (N.D. Cal. 2017) (rejecting the argument that adding the concept of "tapping" to claims cannot supply an inventive concept because tapping was known in the art, as that argument "conflates patent eligibility with novelty[,]" which are separate inquires, and finding that adding in tapping amounted to an inventive concept because "it transforms a more abstract device pairing process into something specific").

The Federal Circuit has also explained that the step two analysis may involve "disputes over underlying facts[,]" like whether a claim element or claimed combination is in fact "well-understood, routine and conventional to a skilled artisan at the time of the patent[.]" *Berkheimer*, 881 F.3d at 1369.  Content that creates this type of fact dispute may be found in a plaintiff's complaint, so long as the complaint's allegations are not "wholly divorced from the claims or the specification[.]"  *Cellspin Soft, Inc. v. Fitbit, Inc*., 927 F.3d 1306, 1317 (Fed. Cir. 2019).

Having set out the law, the Court turns back to Ficep's key argument about the identifying step.  Ficep relies heavily on allegations in the FAC in this regard.  The FAC alleges that prior art systems or methods required a human to either "analyze and figure out intersection parameters [relevant to a CAD model] using two dimensional drawings and then [use] a tape measure to manually make marks on a component" or to "manually program manufacturing machines with the information, with the machines then using the intersection parameters to manufacture components based on those components[.]"  (FAC at ¶ 42)  It explains that in the latter process, "the human operator would have [] first examined two dimensional drawings to analyze and identify the intersection parameters that would then be used by the human operator to manually program the manufacturing machines." (*Id*.; *see also* Tr. at 71)  However, the FAC pleads that the claimed inventions identify intersection parameters "different[ly]" than a human would.  (FAC at ¶ 42)  That is because the claims "eliminated the need for a specialized human operator to perform such tasks" since the inventions "*automatically identif[y] the intersection parameters*, extract[] those . . . parameters [and] transmit[]" those parameters to the manufacturing machine.  (*Id*. (emphasis added))  The FAC further alludes to this difference when it alleges that via the patent's claims "*certain intersection . . . parameters are automatically identified, rather than requiring any human to have to analyze such information and manually*

14

*program it into a machine*, for example, and then based on those parameters, the components . . . are manufactured, including, for example, by using those automatically identified parameters to scribe lines onto the steel components that indicate where one steel component is supposed to connect to another steel component[.]" (*Id.* at ¶ 41 (emphasis added))[4]

These above-referenced allegations in the FAC do appear to align with (or at least do not conflict with) the content of the '719 patent. They bear at least some relation, for example, to the patent's statement that in the claimed inventions "design parameters related to intersections and points of contact or connection between components that come into contact with other components are included as design parameters[.]" ('719 patent, col. 1:49-53; *see also* Tr. at 45-47; *id*. at 49) They also bear some relation to claim 7, which includes the identifying step. ('719 patent, col. 8:43-45) And there does not seem to be anything in the patent that *contradicts* the FAC's allegations. So if the FAC's allegations are correct, and the claimed inventions do

---

[4] The FAC also cites to an article praising the invention, which was published in November 2011 in Modern Steel Construction and is entitled "Automated Layout in Steel Fabrication." (FAC at ¶ 44 (quotation marks omitted)) Ficep's answering brief attaches the article as an exhibit. (D.I. 19, ex. A) In resolving motions to dismiss under Rule 12(b)(6), courts generally consider only the allegations in the complaint, exhibits attached to the complaint, matters of public record, and documents integral to or explicitly relied upon in the complaint. *See, e.g.*, *U.S. Express Lines, Ltd. v. Higgins*, 281 F.3d 383, 388 (3d Cir. 2002); *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). Because this article is explicitly relied upon in the FAC, the Court may consider it here.

The article could be read as supporting the FAC's allegations, in that it opines that Ficep made a "big breakthrough" in "automated layout and marking" that "was related to the ability of Ficep machines to extract data from detailing software and import it directly to a machine for automated scribing." (D.I, 19, ex. A at 41) However, what is less clear is exactly what *was* the "big breakthrough." Did it have to do with the identifying step of the asserted patent? Did it amount to something more than merely using a computer to speed up a previously known human-performed process? This the article does not say.

identify intersection parameters in a fundamentally different way than what a human was doing in the prior art, this could make a difference from a patent eligibility perspective.[5]

Admittedly, one difficulty for Ficep here is that, as Peddinghaus repeatedly notes, (D.I. 16 at 7-8, 11, 14, 19-20; D.I. 20 at 8-10; Tr. at 17, 25-26, 83), claim 7 does not say very much about *how* the programmable logic controller in claim 7 actually identifies intersection parameters. Had the claim included more particularized language about that "how," it might have made the Motion less of a close call. Yet to the Court, this simply indicates that claim construction might be needed before a final call can be made on this Section 101 issue. That is, the Section 101 calculus could turn on exactly what the claim's reference to "identif[ying] a plurality of intersection parameters" requires, and, from there, on how that process differs (if at all) from how a human calculated those parameters manually in working with prior art systems and processes. (Tr. at 65 (Ficep's counsel responding to the Court's question about what the claim language requires with regard to the identifying step by arguing that the answer might involve "a bunch of Markman arguments"); *id.* at 60, 67 (same); Ficep's Hearing Presentation, Slide 25)[6] The District Court has not yet engaged in claim construction, and so this is another

---

[5] *See, e.g.*, *Cellspin*, 927 F.3d at 1317-18 (explaining that "plausible and specific factual allegations that aspects of the claims are inventive are sufficient" and that "[a]s long as what makes the claims inventive is recited by the claims, the specification need not expressly list all the reasons why this claimed structure is unconventional"); *Peloton Interactive, Inc. v. Echelon Fitness, LLC*, No. 19-cv-1903-RGA, 2020 WL 3640064, at *4 (D. Del. July 6, 2020) ("The fact that Plaintiff's amended complaint does not contain citations to the specification does not preclude my finding that the complaint plausibly alleges an inventive concept. . . . because the claims of the patents at issue recite the aspects that Plaintiff alleges in the amended complaint make them inventive.").

[6] The Court acknowledges that in its briefing, Ficep did not advocate for claim construction of the identifying step, nor did it propose a claim construction for that step. (Tr. at 84-85) But in the Court's view, the most important thing is to get the right answer to this patent eligibility dispute. And so if the Court can see how claim construction could be helpful and necessary to the Section 101 analysis, then Ficep's failure to better advocate for that in its

reason why grant of the Motion now would be inadvisable. *Blackbird Tech v. Uber Techs., Inc.*, C.A. No. 19-561 (MN), C.A. No. 19-561 (MN), C.A. No. 19-566 (MN), 2020 WL 58535, at *6 (D. Del. Jan. 6, 2020) (denying defendant's Section 101 motion to dismiss because, *inter alia*, "[a]t this stage and on the limited record presently available and properly considered on a motion to dismiss, important issues of claim construction cannot be resolved in order for the Court to reach a finding at step two").

Peddinghaus has a few rejoinders to Ficep's arguments. The Court will address each below, explaining why they do not counsel in favor of granting the Motion.

First Peddinghaus asserts that, despite what the FAC says, "the claims encompass achieving the result by the *same means* used by human operators[.]" (D.I. 20 at 6-8 (emphasis added); *see also* D.I. 16 at 9-10; Tr. at 27 (Peddinghaus' counsel stating that the identifying step "has to be broad enough to . . . encompass exactly the way a human would have identified those parameters"); *id*. at 78-80) In support, Peddinghaus cites to the "Detailed Description of Preferred Embodiments" section of the specification, which explains that:

> After identifying the intersection and/or manufacturing parameters (step **115**), the method **100** proceeds to extract from the design model the intersection and/or manufacturing parameters. Typically, this includes *copying or recording* the intersection parameters and the original intersection parameters, and all the other data, *which are present in the design model* and are not lost.

('719 patent, col. 4:28-35 (emphasis added) (*cited in* D.I. 20 at 7)) But this portion of the specification is discussing the *invention claimed in the patent*. And so far as the Court can see,

---

briefing should not stop that process from occurring. *See Aatrix Software, Inc v. Green Shades Software, Inc.*, 882 F.3d 1121, 1128 (Fed. Cir. 2018) (noting that sometimes, "the need for claim construction might be apparent just from the claim terms themselves, to arrive at 'a full understanding of the basic character of the claimed subject matter'") (citation omitted); *see also Blackbird Tech v. Uber Techs., Inc.*, C.A. No. 19-561 (MN), C.A. No. 19-566 (MN), 2020 WL 58535, at *6 (D. Del. Jan. 6, 2020).

when it comes to identifying intersection parameters from a CAD file, the patent does *not* clearly say that humans had been doing that for years in just the same way that the invention does it. (Tr. at 27-28)

Second, Peddinghaus cites to the sentence in the "Object of the Invention" section that states: "[t]o increase efficiency and reduce cost, the systems and methods of the present invention may be based on information included as part of existing computer-aided designs." ('719 patent, col. 2:2-5; *see also* D.I. 16 at 4, 9, 19; Tr. at 76-77) But this passage does not say anything specific about intersection parameters or about the way they were identified in the prior art.[7]

Third, Peddinghaus argues that the FAC's allegations amount to "unsupported legal conclusions" that the Court need not accept as true. (D.I. 16 at 14; D.I. 20 at 1-3; Tr. at 8, 29) To be sure, the FAC's allegations about eligibility could have been more robust. (Tr. at 75) If they had been, Ficep's position might have been stronger. But in the FAC, Ficep does not simply invoke legal buzzwords regarding eligibility in describing the identifying limitation. It also sets out some facts describing how the limitation contributes to eligibility. (FAC at ¶¶ 41-42)[8]

---

[7] Peddinghaus' opening brief cites to some additional portions of the "Objects of the Invention" section of the specification in support of its argument that CAD files long contained intersection parameters. (D.I. 16 at 9 (citing '719 patent, cols. 5:17-26, 6:63-67)) But these portions too are describing the *claimed invention*, and thus not necessarily the prior art.

[8] The FAC here thus seems distinguishable from that in *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529 (Fed. Cir. 2020), cited by Peddinghaus, (D.I. 16 at 14). In *Dropbox*, the Federal Circuit explained that the plaintiff's complaint asserted only conclusory allegations insufficient to survive the defendant's Section 101 challenge, where the complaint simply restated the claim elements and "append[ed] a conclusory statement" that the inventions were not well-known, routine or conventional in the field at the time of patenting. *Dropbox*, 815 F. App'x at 538. Here, the FAC's allegations are more detailed than that.

### C. Conclusion

Accordingly, the FAC's allegations, viewed in the light most favorable to Plaintiff, and taken together with the specification, create a material factual dispute as to patent eligibility. At this early stage of the proceedings, there is just enough here to recommend that the Motion be denied.[9]

## IV. CONCLUSION

For the foregoing reasons, the Court recommends that Peddinghaus's Motion be DENIED without prejudice to Peddinghaus's ability to raise Section 101 eligibility issues at the summary judgment stage.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The failure of a party to object to legal conclusions may result in the loss of the right to *de novo* review in the district court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878-79 (3d Cir. 1987).

The parties are directed to the Court's Standing Order for Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the District Court's website, located at http://www.ded.uscourts.gov.

---

[9] In contrast, in *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363 (Fed. Cir. 2019), cited by Peddinghaus as being comparable to this case, (D.I. 16 at 13-14; D.I. 20 at 7 n.4), the Federal Circuit determined at step one that the patent was ineligible because the patent "acknowledge[d] that data from bedside machines was previously collected, analyzed, manipulated, and displayed manually, and it simply proposes doing so with a computer[,]" 916 F.3d at 1367. Here, Plaintiff is asserting that certain data utilized by prior art processes or systems was *not* previously collected, analyzed, manipulated or displayed in the same manner as does the apparatus claimed in claim 7.

Dated:  January 26, 2020

_Christopher J. Burke_
Christopher J. Burke
UNITED STATES MAGISTRATE JUDGE

20