**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

FICEP CORPORATION,

     Plaintiff,

     v.

PEDDINGHAUS CORPORATION,

     Defendants.

C.A. No. 19-1994-RGA

**JURY TRIAL DEMANDED**

**OPENING BRIEF IN SUPPORT OF DEFENDANT PEDDINGHAUS'S MOTION FOR**
**SUMMARY JUDGMENT OF UNPATENTABILITY UNDER 35 U.S.C. § 101**

OF COUNSEL:
Stephanie P. Koh
John W. McBride
Jason P. Greenhut
Leif E. Peterson, II
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
312-853-7000

Dated: July 7, 2021

Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
One Rodney Square
920 N. King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendant Peddinghaus*
*Corporation*

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .................................................................................................. ii

I.      INTRODUCTION ....................................................................................................... 1

II.     STATEMENT OF UNDISPUTED FACTS ............................................................... 2

III.    PROCEDURAL HISTORY ........................................................................................ 6

IV.     LEGAL STANDARDS ............................................................................................... 7

V.      THE CLAIMS OF THE '719 PATENT ARE INELIGIBLE UNDER § 101. ................. 10

        A.      *Alice*, Step 1: The Claims of the '719 Patent Are Directed to the Abstract
                Idea of Identifying, Extracting, and Transferring Data from a Design File
                for the Purpose of Manufacturing an Object. ........................................................ 10

        B.      *Alice*, Step 2: The Claims of the '719 Patent Lack Any Inventive Concept. ......... 15

                1.      The Claims Recite Computer Components Performing As Expected. ....... 15

                2.      The Claims Preempt All Computerized Methods of Extracting
                        Component and Intersection Information From a Design Model. ............. 19

        C.      Recent Federal Circuit Precedent Dictates That The Claims are Ineligible. ......... 20

        D.      "Identifying" Cannot Be Construed to Confer Patent Eligibility. ........................ 23

VI.     CONCLUSION ........................................................................................................... 25

i

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Affinity Labs of Tex., LLC v. DIRECTV, LLC*,
    838 F.3d 1253 (Fed. Cir. 2016)..................................................................................9, 11

*Alice Corporation Pty. Ltd. v. CLS Bank International*,
    573 U.S. 208 (2014).................................................................................... *passim*

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................7

*Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*,
    687 F.3d 1266 (Fed. Cir. 2012)........................................................................15

*Bilski v. Kappos*,
    561 U.S. 593 (2010)........................................................................................9

*British Telecomms. PLC v. IAC/InterActiveCorp*,
    381 F. Supp. 3d 293 (D. Del. 2019), *aff'd*, 813 F. App'x 584 (Fed. Cir. 2020) .....................18

*BSG Tech LLC v. Buyseasons, Inc.*,
    899 F.3d 1281 (Fed. Cir. 2018)........................................................................13

*Clarilogic, Inc. v. FormFree Holdings Corp.*,
    681 F. App'x 950 (Fed. Cir. 2017) ..............................................................14, 19

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
    776 F.3d 1343 (Fed. Cir. 2014)......................................................................3, 13

*Credit Acceptance Corp. v. Westlake Servs.*,
    859 F.3d 1044 (Fed. Cir. 2017)........................................................................13

*CyberSource Corp. v. Retail Decisions, Inc.*,
    654 F.3d 1366 (Fed. Cir. 2011)........................................................................10

*Dropbox, Inc. v. Synchronoss Techs., Inc.*,
    815 F. App'x 529 (Fed. Cir. 2020) ................................................................ *passim*

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)........................................................................13

*Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*,
    955 F.3d 1317 (Fed. Cir. 2020), *cert. denied*, 2021 WL 1951814 (U.S. May
    17, 2021) ...........................................................................................14, 22

ii

*Genetic Techs. Ltd. v. Merial LLC,*
    818 F.3d 1369 (Fed. Cir. 2016)..................................................................................7

*iLife Technologies, Inc. v. Nintendo of America, Inc.,*
    839 F. App'x 534 (Fed. Cir. 2021) ...........................................................................20

*Intell. Ventures I LLC v. Cap. One Bank (USA),*
    792 F.3d 1363 (Fed. Cir. 2015).........................................................................13, 15

*Intell. Ventures I LLC v. Symantec Corp.,*
    838 F.3d 1307 (Fed. Cir. 2016)................................................................15, 18, 19

*IpLearn, LLC v. K12 Inc.,*
    76 F. Supp. 3d 525 (D. Del. 2014) .............................................................................7

*Joao Control & Monitoring Sys., LLC v. Telular Corp.,*
    173 F. Supp. 3d 717 (N.D. Ill. 2016) .......................................................................17

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.,*
    566 U.S. 66 (2012) .....................................................................................................8

*McRO, Inc. v. Bandai Namco Games Am. Inc.,*
    837 F.3d 1299 (Fed. Cir. 2016).................................................................................20

*OIP Techs., Inc. v. Amazon.com, Inc.,*
    788 F.3d 1359 (Fed. Cir. 2015).................................................................................11

*Palomar Techs., Inc. v. MRSI Sys., LLC,*
    462 F. Supp. 3d 13 (D. Mass. 2020) .........................................................................12

*Peschke Map Techs. LLC v. Rouse Props. Inc.,*
    168 F. Supp. 3d 881 (E.D. Va. 2016) .........................................................................9

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) .............................................................24

*Realtime Data LLC v. Array Networks Inc.,*
    No. 17-0800-CFC, 2021 WL 1752045 (D. Del. May 4, 2021) ...................... *passim*

*Sandbox Software, LLC v. 18Birdies, LLC,*
    C.A. No. 18-1649 (MN), 2019 WL 2524780 (D. Del. June 19, 2019)....................16

*Secured Mail Sols. LLC v. Universal Wilde, Inc.,*
    873 F.3d 905 (Fed. Cir. 2017)...................................................................................18

*Simio, LLC v. FlexSim Software Prods., Inc.,*
    983 F.3d 1353 (Fed. Cir. 2020).................................................................................23

*Smart Sys. Innovations, LLC v. Chi. Transit Auth.*,
   873 F.3d 1364 (Fed. Cir. 2017).............................................................................................12

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
   C.A. No. 17-1390-LPS-CJB, 2020 WL 362789 (D. Del. Jan. 22, 2020) ...............................12

*In re TLI Commc'ns LLC Pat. Litig.*,
   823 F.3d 607 (Fed. Cir. 2016)....................................................................................8, 12, 16

*Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*,
   874 F.3d 1329 (Fed. Cir. 2017).............................................................................................18

*Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*,
   916 F.3d 1363 (Fed. Cir. 2019)...................................................................................1, 22, 23

*WhitServe LLC v. Dropbox, Inc.*,
   No. 2019-2334, 2021 WL 1608941 (Fed. Cir. Apr. 26, 2021) ...........................................7, 14

*Yu v. Apple Inc.*,
   No. 2020-1760, 2021 WL 2385520 (Fed. Cir. June 11, 2021) ...................................... *passim*

**Statutes**

35 U.S.C. § 101 ............................................................................................................ *passim*

**Other Authorities**

Fed. R. Civ. P. 56 ...............................................................................................................1, 7

Defendant Peddinghaus Corporation ("Peddinghaus") respectfully moves pursuant to Fed. R. Civ. P. 56 for summary judgment that U.S. Patent No. 7,974,719 ("the '719 patent"), the lone patent asserted by Plaintiff Ficep Corporation ("Ficep"), is invalid under 35 U.S.C. § 101 for claiming ineligible subject matter.

## I.    INTRODUCTION

The '719 patent is directed to the abstract idea of identifying, extracting, and transferring data from a design file for the purpose of manufacturing an object. And the patent seeks to claim this abstract idea implemented on conventional computer components, defined in purely results-based language and performing their ordinary and expected functions. The '719 patent would thus preempt all methods of automating a process that the patent itself admits conventionally took place in the human mind: (1) identifying the dimensions and intersections of the components of a three-dimensional design, (2) extracting that information from a design model, and (3) converting that information to instructions for manufacturing the object. In short, this is "a quintessential 'do it on a computer' patent" that "acknowledges" that design data was previously "collected, analyzed, manipulated, and displayed manually" and now "simply proposes doing so with a computer" to improve accuracy and efficiency. *Univ. of Fla. Research Found., Inc. v. Gen. Elec. Co.*, 916 F.3d 1363, 1367 (Fed. Cir. 2019).

Ficep has attempted to recast the invention as a "real-world physical machine, scribing lines into real-world steel components" using a supposedly unconventional method of identifying intersection parameters from the design model. D.I. 19 at 2, 7. But it is well-established that the mere inclusion of physical machines does not make a claim eligible. Instead, patent eligibility is assessed on what the claims *actually* say, not what Ficep *wishes* they said. Here, the claims do not recite any unconventional way (or any way at all) for identifying intersection information; at best, the specification explains that intersection information may be simply *copied* from existing

1

design models. Likewise, the claims' recitation of manufacturing an object—with no mention of the "scribing" that Ficep now claims is so important—is mere post-solution activity with no relevance to the § 101 analysis. Because it can be determined from the face of the patent that the claims are abstract and the components recited therein were well-known and routine, there is no genuine dispute of material fact precluding summary judgment of invalidity under § 101.

## II.     STATEMENT OF UNDISPUTED FACTS

The '719 patent (D.I. 13, Exhibit A ("Pat.")) discusses the well-known process of manufacturing objects using programmable machining tools that existed long before the filing of the '719 patent. *Id*. at 1:26-36. As the patent explains, computer-aided design ("CAD") programs are frequently used in the industry to allow designers to create models of physical objects. *Id.* at 1:7-17. In order to transition from design model to manufacture, the information contained within a typical CAD model must be converted to a format usable by machining tools. The '719 patent notes that, in prior art systems, "[CAD] specifications indicated in a [CAD] display must be passed manually by a human operator … to the automated assembly line equipment for the manufacture of a device or structure." *Id*. at 1:37-41; *see also id.* at 1:26-30 ("[A] human operator typically must program manually the manufacturing machines associated with an assembly line based on the computer-aided design display."); *id.* at 1:32-36 ("Human intervention is generally necessary to review the [CAD] information and to provide the necessary information to the automated assembly line apparatus so that the structure or device may be manufactured."); D.I. 30 at 9 ("[T]he human operator would first review the CAD information that was visually produced on the computer display, and then input the CAD design specifications into the automated assembly line apparatus."). Ficep acknowledges that, in the prior art, human operators were capable of carrying out the process of identifying and extracting intersection and other parameters mentally or by pen and paper methods, such as "analyz[ing]

2

and figur[ing] out intersection parameters [from a CAD model]" using "two dimensional drawings [i.e. blueprints] to analyze and identify the intersection parameters." D.I. 32 at 3; *see also id.* at 4 ("In the prior art, a human being reviewed 2D drawings, identified intersection parameters, and then marked them by hand" or "manually input those parameters into a computer before the machine could do the marking.").

To "eliminate the possibility of operator error when providing instructions to automated assembly line equipment" and "increase efficiency," the '719 patent purports to improve upon the mental process of identifying and extracting design parameters—which are "included as part of existing computer-aided designs"—and converting those parameters to machine instructions. Pat. at 1:53-2:5; D.I. 19 at 2 (Ficep acknowledging that "[t]he patented invention relates to the analysis of electronic versions of construction plans"). To that end, the patent replaces the human operator with generic computer hardware that can automatically "identify" and "extract" information from a design model. Pat. at 3:53-58, 4:4-47; *see also* D.I. 32 at 3 (Ficep arguing that in the prior art "the machine does not identify intersection parameters from a 3D CAD model and could not mark them on components"). The extracted information is then sent to a conventional manufacturing machine, which manufactures the components. Pat. at 4:48-51.

Independent claims 1, 7, and 14 recite substantially the same limitations, but are worded in the form of a method, apparatus, and article of manufacture claim, respectively. Representative[1] claim 7, directed to the apparatus, recites the following limitations:

---

[1] While Ficep initially challenged the selection of claim 7 as representative in its opposition to Peddinghaus's motion to dismiss, Ficep did not maintain this position at oral argument or in subsequent briefing. Nor could it. A representative claim is correctly identified if "all the claims are substantially similar and linked to the same abstract idea." *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1348 (Fed. Cir. 2014); *Realtime Data LLC v. Array Networks Inc.*, No. 17-0800-CFC, 2021 WL 1752045, *10 (D. Del.

| Preamble | An apparatus for automatic manufacture of an object, comprising: |
|---|---|
| 7[a] | a computing device adapted to create a design model of an object having multiple individual components, at least two of the individual components defining an intersection at which the two components are in contact with one another; |
| 7[b] | at least one programmable logic controller in communication with the computing device and with at least one manufacturing machine; |
| 7[c] | a receiver associated with the programmable logic controller for receiving the design model of the object; |
| 7[d] | a database unit adapted to store the design model received at the receiver; |
| 7[e] | a processor which is associated with the programmable logic controller and extracts from the design model a plurality of dimensions of components which define a plurality of components of the object; |
| 7[f] | wherein the processor identifies a plurality of intersection parameters which define the intersection of the two components; |
| 7[g] | wherein the processor extracts from the design model the intersection parameters; |
| 7[h] | a transmitter associated with the processor for transmitting the intersection and machining parameters and the component dimensions from the programmable logic controller to the at least one manufacturing machine; and |
| 7[i] | wherein the at least one manufacturing machine manufactures the components based at least in part on the transmitted component dimensions and on the transmitted intersection and manufacturing parameters. |

The '719 patent does not claim or describe specialized hardware for performing the task

of automatically manufacturing an object from a design model, nor does it claim any particular

---

May 4, 2021) ("When the only difference between claims is the form in which they are drafted, it is appropriate to treat them as equivalent for purposes of patent eligibility under § 101."). Claims 1, 7, and 14 recite the same limitations—a "computing device," "design model," "receiving," "storing," "extracting," "identifying," "dimensions," "intersection and manufacturing parameters," "transmitting," and "manufacturing"—in substantially the same order and using similar language. *Realtime Data*, 2021 WL 1752045, at *7 ("The independent claims are all directed to various wordings of this same procedure …. The dependent claims are directed to the same abstract process and do not add any unconventional or inventive steps."). The dependent claims do not add limitations that alter the eligibility analysis (*see infra* n.6).

algorithm or procedure for identifying and extracting the "dimensions" and "intersection parameters" from the design model. Instead, the specification explains that the invention merely replaces a human operator with a "programmable logic controller," which is defined as "[a]ny device capable of processing a design model" without further detail as to its actual functioning. Pat. at 5:31-62. The specification does, however, make clear that "the method" of the invention encompasses "extract[ing] from the design model the intersection and/or manufacturing parameters" simply by "*copying or recording* the intersection parameters … and all the other data, *which are present in the design model*." Pat. at 4:28-35 (emphases added). Likewise, the specification confirms that human operators of the prior art extracted this same information from design models and transferred it to manufacturing machines, and in no way requires that the claimed invention generates new information or performs this task differently than the human operator. *Id.* at 2:2-5 ("[T]he systems and methods of the present invention may be based on information included as part of existing computer-aided designs."); *id.* at 1:57-58 (prior art "manual marking-out operations can be performed automatically").

The claims conclude with a "manufacturing machine," defined as any "machine, such as a machine which forms a part of an assembly line, which assembles, marks out and/or welds, builds or creates all or part of the object to be manufactured or a component of the object," all of which the specification explains were well-known in the prior art. *Id.* at 6:3-8; *id*. 1:14-58 (admitting "manufacturing machines associated with an assembly line" are part of the prior art); Ex. 1 at 5 (confirming the "manufacturing machine[]" is what human operators "manually program[med]" in the prior art).[2] In other words, any machine with any of the above functions will do, and no purportedly inventive feature of the manufacturing machine is claimed.

---

[2] "Ex." refers to the exhibits to the Declaration of Leif Peterson submitted concurrently herewith.

## III.   PROCEDURAL HISTORY

On May 28, 2020, Peddinghaus moved to dismiss Ficep's Complaint under § 101. D.I. 8. Ficep filed an Amended Complaint, and Peddinghaus renewed its motion. D.I. 13; D.I. 15. The Court referred the motion to Magistrate Judge Burke, who held a hearing. D.I. 28.

On January 26, 2021, Judge Burke issued a Report and Recommendation (D.I. 30, "Report"). At *Alice* step one, the Report assumed that the claims were directed to the abstract idea of "identifying, extracting, and transferring data from a design file for the purpose of manufacturing an object" (D.I. 30 at 8), but found that Ficep's Complaint raised questions of fact at *Alice* step two that were "just enough … to recommend that the Motion be denied." *Id.* at 15-16, 19. In particular, the Report recognized that "[m]uch of the content of columns 1 and 2 of the patent… really *does* seem to read as if the patent is saying that its claims are focused on (1) taking a previously-existing human process (i.e., manually programming design parameters into manufacturing machines associated with an assembly line) and (2) simply automating that process via a computer, so that it can be done more accurately." *Id.* at 10-11 n.3. But the Report went on to identify Ficep's "key argument" that the identification of "intersection parameters" entails the creation of "new information about intersection parameters" and is necessarily performed "different[ly]" than identification by a human operator. *Id.* at 10, 14-16. The Report then held that the Complaint raised the possibility that, if the claims were ultimately construed in a particular (but unspecified) way, there may be an inventive concept that would save them. *Id.* at 15-16. As to *how* the invention implements this aspect of the claims, the Report recognized that the patent and claims are silent. *Id.* at 14; *id.* at 11-12 ("Ficep's best evidence about the identifying step comes from outside the patent (i.e., from the [Complaint]).")*; id.* at 16 ("[C]laim 7 does not say very much about *how* the [PLC] … actually identifies intersection parameters."); *id.* at 11-12 ("[T]he '719 patent itself does not really have a lot to say about intersection

6

parameters, nor about why the identifying step in claim 7 helps demonstrate that the claim is not

directed to an abstract idea."). But the Report credited Ficep's allegations at the pleading stage,

and recommended denying the motion "at least for now." *Id.* at 10-11 n.2.

Peddinghaus filed an objection to the Report. *See* D.I. 31. The Court denied the objection,

holding that, because Peddinghaus had failed to "address the Report's lack of a conclusion" as to

*Alice* step one, there was no "finding that the patent is directed to an abstract idea." D.I. 33 at 1-

2. However, the Court stated that "there is a serious question of patent eligibility," and suggested

"an early summary judgment motion on the patent eligibility issue." *Id.* at 2.

## IV.   LEGAL STANDARDS

Summary judgment is appropriate when "there is no genuine dispute as to any material

fact" and "the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact

is "material" only if its resolution will affect the outcome of the suit. *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).

Patent eligibility is a question of law that may be assessed at summary judgment based on

the intrinsic record and claim language, particularly where "the specification provides that the

relevant claim elements are well-understood, routine and conventional." *WhitServe LLC v.*

*Dropbox, Inc.*, No. 2019-2334, 2021 WL 1608941, at *5 (Fed. Cir. Apr. 26, 2021); *IpLearn, LLC*

*v. K12 Inc.*, 76 F. Supp. 3d 525, 531 n.6 (D. Del. 2014) ("[S]ection 101 determinations are

questions of law, and a threshold inquiry.").[3] A patentee may not conjure a factual dispute by

---

[3] Claim construction and expert discovery are often unnecessary to assess eligibility, particularly
where the abstract idea and lack of inventive concept can be appreciated from the face of the
patent. *See Yu v. Apple Inc.*, No. 2020-1760, 2021 WL 2385520, *5 (Fed. Cir. June 11, 2021)
("[P]atent eligibility can be determined … without the aid of expert discovery" and the court
"need not accept as true allegations that contradict … the claims and the patent specification");
*Genetic Techs. Ltd. v. Merial LLC*, 818 F.3d 1369, 1374 (Fed. Cir. 2016) ("[C]laim construction
is not an inviolable prerequisite to a validity determination under § 101."); *Realtime Data*, 2021

contesting facts set forth in the specification, or arguing aspects of the invention that are not in the claims. *Dropbox, Inc. v. Synchronoss Techs., Inc.*, 815 F. App'x 529, 537 (Fed. Cir. 2020) (allegations that claimed "data structure" provided an inventive concept were contradicted by the specification, and purportedly "inventive data structures" were not "evident in the claims"); *In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 613-14 (Fed. Cir. 2016) (rejecting inventiveness allegations where specification "describe[d] the telephone unit and server as either performing basic computer functions [or] functions 'known' in the art"); *Realtime Data*, 2021 WL 1752045, at *6 (rejecting arguments that "the patents cover new solutions to existing technological problems and that fact discovery is necessary" because "the patents themselves explain that the technologies and methods used in the claimed analyses were well-known and routine").

In determining whether a patent is invalid under § 101, courts apply the framework set forth in *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012), and applied to abstract ideas in *Alice Corporation Pty. Ltd. v. CLS Bank International*, 573 U.S. 208, 217-18 (2014). First, a court determines whether the claims at issue are "directed to" an abstract idea. *Alice*, 573 U.S. at 217. Second, if the claims are directed to an abstract idea, the court must determine whether the claims recite "an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [abstract idea] itself.'" *Id.* at 217-18 (alteration in original) (quoting *Mayo*, 566 U.S. at 72-73). Patent claims that are "directed to" an abstract idea and do not add something "significantly more" to the idea are invalid under § 101. *Id.*

*Alice* step one requires a court to examine the "'focus of the claimed advance over the

---

WL 1752045, at *6 ("The Federal Circuit has 'repeatedly affirmed § 101 rejections … before claim construction or significant discovery has commenced.'").

prior art' to determine if the claim's 'character as a whole' is directed to" an abstract idea. *Affinity Labs of Tex., LLC v. DIRECTV, LLC*, 838 F.3d 1253, 1257 (Fed. Cir. 2016) (citation omitted). The category of abstract ideas includes "well-understood, routine conventional activities." *Peschke Map Techs. LLC v. Rouse Props. Inc.*, 168 F. Supp. 3d 881, 887 (E.D. Va. 2016) (collecting cases). The question of what claims are "directed to" "must focus on the language of the [a]sserted [c]laims themselves, considered in light of the specification." *Yu*, 2021 WL 2385520, at *2 (quoting *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020)). A claim merely "couched as an improved machine" is not necessarily eligible. *Id.* at *3 n.2.

Once the court determines the claims are directed to an abstract idea, it moves to *Alice* step two, in which the court determines whether the claims disclose an "inventive concept" that transforms the abstract idea into a patent-eligible application of that idea. *Alice*, 573 U.S. at 217-18. Here, the court "consider[s] the elements of each claim both individually and 'as an ordered combination' to determine whether the additional elements 'transform the nature of the claim' into a patent-eligible application." *Id.* (quoting *Mayo*, 566 U.S. at 78-79). "[A] mere instruction to implement an abstract idea on a computer" does not make an abstract idea patent eligible. *Id.* at 223. That is to say, steps requiring "a generic computer to perform generic computer functions" cannot save a claim. *Id.* at 225. Nor can reciting features the specification treats as a "black box" render an abstract idea eligible; rather, the claims must "describe *how* to solve the problem in a manner that encompasses more than the 'principle in the abstract.'" *Dropbox*, 815 F. App'x. at 533. An abstract idea also cannot become patentable by limiting the claim to a "particular technological environment." *Bilski v. Kappos*, 561 U.S. 593, 610-11 (2010).

## V.     THE CLAIMS OF THE '719 PATENT ARE INELIGIBLE UNDER § 101.

### A.     *Alice*, Step 1: The Claims of the '719 Patent Are Directed to the Abstract Idea of Identifying, Extracting, and Transferring Data from a Design File for the Purpose of Manufacturing an Object.

At *Alice* step one, if the concept to which the claims are drawn "can be performed in the human mind, or by a human using a pen and paper," the claims are directed to an "unpatentable mental process[]" and are therefore not patent eligible. *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed. Cir. 2011).

The '719 patent makes clear that the claims are fundamentally directed to the unpatentable process of (1) creating a design model that includes the dimensions and intersection points of the components of a three-dimensional design, (2) identifying and extracting that information from the design model, and (3) converting that information to instructions for manufacturing the physical object and transmitting those instructions to conventional manufacturing machines, all of which can be done manually or with pen and paper. The claims add nothing to this manual process beyond taking known systems and implementing the abstract idea using generic computer components to reduce human error and increase efficiency, a tell-tale sign of ineligible abstraction. *See, e.g.*, Pat. at 1:26-30 ("In order to complete the manufacturing process of a structure or device based on a computer-aided design model, a human operator typically must program manually the manufacturing machines associated with an assembly line based on the computer-aided design display."); 1:37-48 ("[T]here is a direct need to improve the way in which the design parameters for all the components of an object … are provided to a manufacturing machine."); 1:53-58 ("[I]t is desirable to eliminate the possibility of operator error when providing instructions to automated assembly line equipment. This robust solution improves efficiency and accuracy and lowers cost, since manual marking-out operations can be performed automatically."). The fact that a claimed apparatus or method

10

may help eliminate human errors by automating the process with a computer is insufficient to impart eligibility. *OIP Techs., Inc. v. Amazon.com, Inc.*, 788 F.3d 1359, 1363 (Fed. Cir. 2015) ("[R]elying on a computer to perform routine tasks more quickly or more accurately is insufficient to render a claim patent eligible.").

A comparison of the claims to the specification confirms that the only "claimed advance over the prior art" is generic computer automation—a classic example of what courts routinely find renders claims abstract. *Affinity Labs*, 838 F.3d at 1257. For example, claim 7 requires the use of a generic "computing device" to create a "design model of an object having multiple individual components," an element the specification admits was routinely used and well known before the filing date of the patent. Pat. at 1:14-25 ("Computer-aided design (CAD) programs and systems may be used to design detailed three-dimensional models of physical objects, such as structural or mechanical parts of a structure or device."). Likewise, the claim requires identifying and extracting information such as "dimensions" and "intersection parameters" from the design model, a process the specification also acknowledges was well known and typically performed "manually by a human operator." *Id.* at 1:26-30; 1:37-43. Finally, claim 7 requires that a manufacturing machine produce an object based on the information that has been extracted from the design model, which the patent also admits was known in the art and long performed by human operators. *Id*. at 1:30-36 ("Production is then enabled once the appropriate information has been communicated to the assembly line. Human intervention is generally necessary to review the computer-aided design information and to provide the necessary information to the automated assembly line apparatus so that the structure or device may be manufactured.").

The fact that the claims conclude with a limitation requiring the manufacture of an object does not render them patent eligible. As the Federal Circuit has held, the fact that the claim

recites a "real-world physical system" (D.I. 32 at 9), or, in other words, steps "'necessarily' performed 'in the physical, rather than purely conceptual, realm … is beside the point.'" *Smart Sys. Innovations, LLC v. Chi. Transit Auth.*, 873 F.3d 1364, 1373 (Fed. Cir. 2017); *Yu*, 2021 WL 2385520, at *3 n.2 (claims directed to "improved digital camera" were ineligible under § 101); *Palomar Techs., Inc. v. MRSI Sys., LLC*, 462 F. Supp. 3d 13, 25 (D. Mass. 2020) ("[A]lthough the patent ostensibly covers processes that occur in the physical world of manufacturing, that does not mean it cannot be abstract."). Here, the patent does not even purport to claim a new type of manufacturing machine, effectively confirming that manufacturing components is the type of post-solution activity that is irrelevant under § 101. *In re TLI*, 823 F.3d at 611-12 ("[N]ot every claim that recites concrete, tangible components escapes the reach of the abstract-idea inquiry," especially where the "recited physical components merely provide a generic environment in which to carry out the abstract idea" and are devoid of "any technical details."); *Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, C.A. No. 17-1390-LPS-CJB, 2020 WL 362789, at *6 (D. Del. Jan. 22, 2020) ("It is not dispositive that the claim makes reference to a physical, tangible item that is something other than a computer component (here, an 'injector'). What matters is that the 'injector' is described generically in the specification in a way that provides no indication that it … is the key focus or basic thrust of the claim.").[4]

---

[4] Ficep's Complaint alleged that the claimed manufacturing machine uses "automatically identified parameters to scribe lines onto the steel components that indicate where one steel component is supposed to connect to another steel component, as well as other information such as part numbers." D.I. 13, ¶ 41. These allegations are not supported by the claims or specification. As explained above (*supra* § II), the specification explains that the manufacturing machine is a machine with any of several capabilities. Pat. at 6:3-8; 1:14-58. There is no requirement that the manufacturing machine is capable of scribing information onto steel beams. Nor does Ficep purport to have invented the first machine capable of scribing lines.  In fact, the word "scribing" does not even appear in the specification or claims. Regardless, even if the claims explicitly recited "scribing" on steel beams, Ficep acknowledges that human operators accomplished this task at least by using a "a tape measure to manually make marks." D.I. 32 at 3.

Because the specification concedes that all of the above features were well known in the art, the only purported novelty, and the focus of the alleged invention of the '719 patent, is the use of generic computing equipment to automate the previously-manual data identification, extraction, and transfer process. But as the Federal Circuit has long held, "mere automation of manual processes using generic computers does not constitute a patentable improvement in computer technology." *Credit Acceptance Corp. v. Westlake Servs.*, 859 F.3d 1044, 1055 (Fed. Cir. 2017); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1354 (Fed. Cir. 2016) (claims directed to an abstract idea where the "focus of the claims is not on such an improvement in computers as tools, but on certain independently abstract ideas that use computers as tools"); *Intell. Ventures I LLC v. Cap. One Bank (USA)*, 792 F.3d 1363, 1370-71 (Fed. Cir. 2015) ("[S]teps that do nothing more than spell out what it means to 'apply it on a computer' cannot confer patent eligibility."); *Content Extraction*, 776 F.3d at 1347 ("[H]umans have always performed [the] functions" of "data collection, recognition, and storage.").

The patent's recitation of generic computer components for carrying out the abstract idea—including a "programmable logic controller" defined as having a "receiver," "database unit," "processor," and "transmitter" (Pat. at 8:32-51)—does nothing to save the claims. *BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1286 (Fed. Cir. 2018) ("[C]laims are not saved from abstraction merely because they recite components more specific than a generic computer."). Indeed, reciting components such as the "programmable logic controller" that are essentially a "black box" cannot "modify the focus of the claims" in a patent-eligible way. *Dropbox*, 815 F. App'x at 533 (claimed "access checker" was "nothing but a functional abstraction" that the specification treated as a "black box," and thus the patent failed "to describe *how* to solve the problem in a manner that encompasses something more than the 'principle in

13

the abstract'"). The fact that such components are described and claimed in purely functional

terms, without details as to any process used by the "programmable logic controller" to identify

and extract data from the design model, is emblematic of the fact that the claims are inherently

abstract at *Alice* step one. *See, e.g.*, *Ericsson Inc. v. TCL Commc'n Tech. Holdings Ltd.*, 955 F.3d

1317, 1328 (Fed. Cir. 2020) (holding claims directed to "controlling access" abstract at *Alice*

step one where they were "drafted functionally" and "silent as to how access is controlled"

because they "merely [made] generic functional recitations that requests are made and then

granted"), *cert. denied*, 2021 WL 1951814 (U.S. May 17, 2021); *Realtime Data*, 2021 WL

1752045, at *16 ("The patents do not provide a technical solution to a technical problem because

they do not teach how to engineer an improved system … The asserted patents allow the use of

*any* compression method … The patents do not teach a technical solution to analyze data … Nor

do the patents teach how to achieve the claimed efficiency benefits, beyond directing the skilled

artisan to apply well-known techniques.").[5]

　　　　Thus, Ficep's assertion that the claims "use computers that perform computations" (D.I.

32 at 9) cannot support patentability, because neither the specification nor claims provide any

detail regarding how the "programmable logic controller" works or any computations it may

perform (let alone any indication it performs differently than a human operator implementing the

same concept). To the contrary, the '719 patent makes clear that "[a]ny device capable of

processing a design model" will do. Pat. at 5:34-36. Thus, the claims are abstract at step one.

---

[5] *See also Clarilogic, Inc. v. FormFree Holdings Corp.*, 681 F. App'x 950, 954 (Fed. Cir. 2017) (where patent failed to "claim[], identif[y], or explain[]" how recited "algorithm engine" worked, court held "[a] method for collection, analysis, and generation of information reports, where the claims are not limited to how the collected information is analyzed or reformed, [was] the height of abstraction"); *WhitServe*, 2021 WL 1608941, at *4 (rejecting argument that claims were directed to patentable technological improvement where "[t]he specification does not … explain the technological processes underlying the purported technological improvement").

**B.**     ***Alice*****, Step 2: The Claims of the '719 Patent Lack Any Inventive Concept.**

The '719 patent claims also fail to include any "inventive concept" to transform the

abstract idea described above into a patent-eligible application of that idea. *Alice*, 573 U.S. at

217-18. The only alleged advantage of the patent is exactly the type repeatedly found to be

insufficient by § 101 case law: accomplishing something faster or more accurately with generic

computing equipment. *See, e.g., Bancorp Servs., L.L.C. v. Sun Life Assur. Co. of Can. (U.S.)*, 687

F.3d 1266, 1278 (Fed. Cir. 2012) ("To salvage an otherwise patent-ineligible process, a computer

must be integral to the claimed invention, facilitating the process in a way that a person making

calculations or computations could not."); *Intell. Ventures I v. Cap. One*, 792 F.3d at 1367

("[C]laiming the improved speed or efficiency inherent with applying the abstract idea on a

computer" does not "provide a sufficient inventive concept."). Indeed, the claims as written

preempt the entire field of automated conversion of data for use by manufacturing machines—

running afoul of the key concern underlying patent eligibility under § 101. *Alice*, 573 U.S. at 216

("We have described the concern that drives this exclusionary principal as one of pre-emption.").

**1.**     **The Claims Recite Computer Components Performing As Expected.**

Rather than identifying specialized components that might yield an inventive concept, the

claims simply recite generic components such as a "programmable logic controller" and

"processor" that amount to nothing more than using "a generic computer … perform[ing] generic

computer functions" to extract information from design models, as human operators have been

doing since at least the creation of CAD programs, and tradespeople have been doing since

architects drew up the first blueprints. *See Alice*, 573 U.S. at 225. As the specification—which is

"particularly useful in determining what is well-known or conventional," *Intell. Ventures I LLC*

*v. Symantec Corp.*, 838 F.3d 1307, 1317 (Fed. Cir. 2016)—confirms, the generic computer

components recited in the claims "behave exactly as expected according to their ordinary use,"

*In re TLI*, 823 F.3d at 615, and in their expected, logical order:

> The programmable logic controller 210 is implemented in order to control and monitor the manufacture of an object. Any device capable of processing a design model as described herein may be considered as a programmable logic controller 210.
> . . . .
> The receiver 215 is associated with the programmable logic controller 210 and receives as input at least one design model of an object.
> . . . .
> The programmable logic controller 210 typically also includes a storage unit 220, which is capable of storing electronic data.
> . . . .
> Further, the programmable logic controller 210 includes a transmitter 225. The transmitter 225 transmits or sends data from the programmable logic controller 210 to an outside destination.
> . . . .
> The monitor 230 … generally accepts data, such as video signals, from a device such as a computer or processor, and displays the data on an electronic display device, such as a computer screen.

Pat. at 5:31-6:1; *Dropbox*, 815 F. App'x at 534 ("[T]he claims recite the application of an abstract idea using conventional and well-understood techniques specified in broad, functional language."); *id.* at 537 ("'Formatting' data, 'tagging' data, 'transmitting' data, and 'retrieving' data are generalized steps to be performed on a computer using conventional computer activity."); *Sandbox Software, LLC v. 18Birdies, LLC*, C.A. No. 18-1649 (MN), 2019 WL 2524780, at *4 (D. Del. June 19, 2019) ("[T]he claim elements are generic computer components functioning in conventional ways and their ordered combination is the only logical order.").[6]

---

[6] Although this analysis refers to the components in representative claim 7, the dependent claims fare no better. Claims 8, 9, and 13 recite further generic computer components such as a "data storage unit," a "monitor," and a "wireless connection" over which the transmitter can send data. Claim 10 adds that an object is assembled from the manufactured components, as it would be in any prior art manufacturing method. Pat. at 1:10-17 (describing assembly of objects from individual components). Claims 11 and 12 merely describe generic aspects of the design model, all of which the specification acknowledges are in the prior art. *Id.* at 1:7-13. Claims 2-6 are directed to similar subject matter, but in the context of method claim 1.

16

Nowhere in the claims or the specification does the patent describe "unconventional software or computer equipment with special capabilities" that could possibly transform the abstract idea into patent eligible subject matter by improving computer functionality. *See Joao Control & Monitoring Sys., LLC v. Telular Corp.,* 173 F. Supp. 3d 717, 730 (N.D. Ill. 2016). Nor does the patent's bare bones disclosure of identifying, extracting, and transmitting data from the design model and into a form understandable by the manufacturing machine yield an eligible invention. For example, while Ficep has argued (without support) that "[a] person of ordinary skill in the art would recognize that a computer uses a different process to perform such tasks than a human operator uses" (D.I. 13, ¶ 42; D.I. 32 at 6-7), the specification says *nothing* to indicate how this is done *at all*, let alone how the computer would perform this task differently than a human. Because the claims fail to describe *any* particular process, the claims encompass a computer doing precisely the steps the specification and Ficep admit humans performed in the prior art. *Dropbox*, 815 F. App'x at 536-37 (claim was "abstract because it recited essentially the same process as a person manually transferring data from one mobile device to another, with the person herself acting as the 'server'" and "fail[ed] to provide specific explanations or technical details describing how it improves the functionality of the generic components").

Nor can the mere use of a computer support Ficep's contention that the identification of intersection parameters is inventive and different from the process used by a human operator. Of course a computer *could* perform tasks differently from a human; that is not the issue. The relevant question is whether the claims contain specific requirements that transform the abstract nature of the claims into a patent-eligible application. Here, as Ficep has confirmed, neither the claims nor the specification recite any particular method of how to identify "intersection parameters," or any specialized equipment for accomplishing that task, thereby "captur[ing] all

17

the different possible ways in which a computer might do [it]" (D.I. 28 at 67:21-68:12), and

rendering the claims ineligible. *See Secured Mail Sols. LLC v. Universal Wilde, Inc.*, 873 F.3d

905, 910-12 (Fed. Cir. 2017) (holding ineligible claims that were "non-specific and lack[ed]

technical detail" including because they "generically provide[d] for the encoding of various data

onto a mail object but [did] not set out how this is to be performed" and recited "[n]o special

rules or details of the [claimed] computers, databases, printers, or scanners"); *Dropbox*, 815 F.

App'x at 534 ("Our cases have consistently held that an 'inventive concept' exists when a claim

'recite[s] a specific, discrete implementation of the abstract idea' where the 'particular

arrangement of elements is a technical improvement over [the] prior art.' This focus on

specificity dovetails with concerns about preemption.").

Even if Ficep *had* invented a method for "identifying" "intersection parameters," the fact

that the particulars of the process are not recited in the claims is fatal at *Alice* step two, which

"concerns itself with claim language, not unclaimed features." *British Telecomms. PLC v.

IAC/InterActiveCorp*, 381 F. Supp. 3d 293, 314 (D. Del. 2019), *aff'd*, 813 F. App'x 584 (Fed.

Cir. 2020); *see Intell. Ventures I*, 838 F.3d at 1316 ("[W]hen a claim directed to an abstract idea

contains no restriction on how the result is accomplished and the mechanism is not described,

although this is stated to be the essential innovation, then the claim is not patent-eligible.")

(cleaned up); *Dropbox*, 815 F. App'x at 535 ("To claim a technological solution to a

technological problem, the patent must actually *claim* the *technological solution.*"); *Two-Way

Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1339 (Fed. Cir. 2017) ("Neither

the protocol nor the selection signals are claimed, precluding their contribution to the inventive

concept determination.").[7]

### 2. The Claims Preempt All Computerized Methods of Extracting Component and Intersection Information From a Design Model.

The '719 patent explicitly states that the claimed invention encompasses the same steps formerly undertaken by humans to identify and extract "intersection" information from the design model. For example, the specification explains that "manual marking-out operations"—*i.e.* the process described by Ficep and the patent as being conducted by human operators to identify intersection parameters (Pat. at 1:26-58; D.I. 13, ¶ 42)—"can be performed automatically" using the claimed invention. Pat. at 1:55-58. The patent further states that the steps of "identifying" and "extract[ing]" intersection and manufacturing parameters from the design model include merely "copying or recording" that information "which are present in the design model." *Id.* at 4:28-35. This same information the computer is said to be copying is what human operators previously "passed manually" from the CAD model to the manufacturing machine. *Id.* at 1:26-30; 1:37-43. In other words, "with the exception of generic computer-implemented steps, there is nothing in the claims themselves that foreclose them from being performed by a human, mentally or with pen and paper." *Intell. Ventures I*, 838 F.3d at 1318.

Without claiming *how* the programmable logic controller (1) works to identify the claimed parameters and actually extracts them from the design model, or (2) improves on the prior art beyond mere automation of a previously manual task, the '719 patent would preclude any and all uses of a computer to identify, extract, and transfer data from design models for use in machining objects. *Alice*, 573 U.S. at 223-24 ("[W]holly generic computer implementation is

---

[7] *See also Clarilogic*, 681 F. App'x at 954-55 (claim that transformed data "via an unknown and unclaimed process" lacked inventive concept); *Yu*, 2021 WL 2385520, at *3 ("[E]ven a specification full of technical details about a physical invention may nonetheless conclude with claims that claim nothing more than the broad law or abstract idea underlying the claims.").

not generally the sort of additional feature that provides any practical assurance that the process is more than a drafting effort designed to monopolize the [abstract idea] itself.") (cleaned up); *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (claims that "abstractly cover results where it matters not by what process or machinery the result is accomplished" are ineligible). Indeed, while Ficep has argued that the claims do not "pre-empt any field," the only non-preempted activity it has identified is a human performing the data identification, extraction, and transmission manually, thus conceding that the claims preempt "all the different possible ways in which a computer might" implement the abstract idea. D.I. 13, ¶ 48; D.I. 28 at 67:21-68:12. Because the claims fail to provide anything "significantly more" than applying the abstract idea of identifying, extracting, and transferring component data from design models to machine tools using a computer, they fail *Alice* step 2 and are ineligible.

### C.  Recent Federal Circuit Precedent Dictates That The Claims Are Ineligible.

The claims here are highly analogous to ones the Federal Circuit has recently found to be ineligible under § 101. For example, in *iLife Technologies, Inc. v. Nintendo of America, Inc.*, the Federal Circuit held that a claim directed to the abstract idea of "gathering, processing, and transmitting information" was ineligible at *Alice* step two because, "[a]side from the abstract idea, the claim recites only generic computer components, including a sensor, a processor, and a communication device" for collecting information that existed in the prior art. 839 F. App'x 534, 536-38 (Fed. Cir. 2021). Here, as in *iLife*, the "specification's description of [the claim] elements confirms they are generic," the specification clarifies that the information identified from the design model was in existing design models, and the claims "do[] not recite any unconventional means or method for configuring or processing that information." *Id.* at 538. While Ficep has previously attempted to distinguish *iLife* on the basis that "the components claimed in the '719 patent, are required to perform functions beyond those that were 'well-understood, routine, [and]

conventional'" (D.I. 32 at 3-4), Ficep's argument finds no support in the language of the claims, which puts no limitation on how those components operate. *See Dropbox*, 815 F. App'x at 537.

More recently, the Federal Circuit's decision in *Yu v. Apple* affirmed the ineligibility of claims directed to a physical device (a digital camera) that merely recited generic camera components and circuitry to achieve the abstract idea of "taking two pictures … and using one picture to enhance the other in some way," thus resulting in the production of an "enhanced" image. 2021 WL 2385520, at *1-2. At *Alice* step one, the patent holder, Yu, did "not dispute that … the idea and practice of using multiple pictures to enhance each other has been known by photographers for over a century," but argued the claims were directed to a patent-eligible improvement in digital cameras by providing a "specific solution" to problems such as "low resolution." *Id.* at *2-3. The court, however, found that the claims "undercut Yu's contention," reasoning that—like the claims of the '719 patent—"[o]nly conventional… components are recited to effectuate the resulting 'enhanced' image—two image sensors, two lenses, an analog-to-digital converting circuitry, an image memory, and a digital processor," which were all "well-known and conventional" and "perform[ed] only their basic functions." *Id.* at *2.

The Federal Circuit also rejected Yu's argument that the claims were directed to a "particular configuration of lenses and image sensors" because, although the specification suggested a "particular configuration is the asserted advance over the prior art," the configuration was not recited in the claims, further underscoring that "the focus of the claimed advance is the abstract idea and not the particular configuration discussed in the specification." *Id.* at *3.[8] Similarly, Ficep's contentions that the method by which the invention identifies and extracts data

---

[8] At step two, the court found that the claims (like Ficep's claims) recited "a high level of generality and merely invoke[d] well-understood, routine, conventional components." *Id.* at *4.

from the design model is somehow inventive, or that the invention entails "scribing/marking out" (*see, e.g.*, D.I. 32 at 2-3, 7, 10), find no support in the claims (or specification), and are thus irrelevant to the eligibility analysis.[9] And finally, the claims in *Yu* were not saved by the fact that they resulted in a transformed "enhanced" image. So too here, Ficep's claims are not saved merely by the transformation of a steel beam or other part through the manufacturing process.

*University of Florida* is also instructive. There, the patentee claimed a method and system for treating patients in a hospital by obtaining "physiologic treatment data" from multiple "bedside machines," using a remote device to convert that data to a different "machine independent format," using the converted data to perform a "programmatic action," and then displaying the results on a user interface. 916 F.3d at 1366-69. The district court found that the claims were directed to the abstract idea of "collecting, analyzing, manipulating, and displaying data" and lacked an inventive concept. *Id.* at 1367. The Federal Circuit affirmed, finding that, as here, the prior art entailed a human operator performing essentially the same task as the claims by identifying, extracting, and transcribing the data, and entering it into information systems manually. *Id.* And, also as here, the only advance over the prior art was the use of computers to "automate [the prior art] 'pen and paper methodologies' to conserve human resources and minimize errors." *Id.* The Federal Circuit found this was "a quintessential 'do it on a computer' patent: it acknowledges that data from bedside machines was previously collected, analyzed, manipulated, and displayed manually, and it simply proposes doing so with a computer." *Id.*

The same result is warranted here. As in *University of Florida*, the '719 patent "nowhere

---

[9] *See also Ericsson*, 955 F.3d at 1327-29 (finding allegedly inventive "three specific layers of software" was "wholly missing from [the claims]," which recited no "particular architecture at all—much less the specific three layered architecture advocated by Ericsson," and thus "cannot provide an inventive concept at step two because it is not recited in [the] claims").

identifies … any 'specific improvement to the way computers operate," and instead states that

the method can be performed using essentially "[a]ny kind of computer system," which it

"predominately describ[es]" in "purely functional terms." *Id.* at 1367-68; *see* Pat. at 5:34-36

("Any device capable of processing a design model as described herein may be considered as a

programmable logic controller."). And, also as in *University of Florida*, here the '719 patent fails

to "explain[] how the [programmable logic controller] do[es] the conversion" of data from the

design model to a form readable by the manufacturing machine. 916 F.3d at 1368. The '719

patent does nothing to improve the way computers operate, but rather attempts to misappropriate

an abstract idea capable of being performed by (and, according to the patent, long performed by)

humans by adding a requirement to perform the abstract idea automatically using computers.

### D.      **"Identifying" Cannot Be Construed to Confer Patent Eligibility.**

Ficep previously suggested that the construction of the "identifying" limitation might be

relevant to the eligibility analysis, and Judge Burke credited that assertion. D.I. 30 at 16 ("[T]he

Section 101 calculus could turn on exactly what the claim's reference to 'identif[ying] a plurality

of intersection parameters' requires, and, from there, on how that process differs (if at all) from

how a human calculated those parameters manually in working with prior art systems and

processes."); D.I. 32 at 4-5. Peddinghaus disagrees that claim construction is necessary to rule on

this motion. *See Simio, LLC v. FlexSim Software Prods., Inc.*, 983 F.3d 1353, 1364 n.7 (Fed. Cir.

2020). And Ficep has previously represented to the Court that it would not be arguing for a

construction "more specific than identify[ing] intersection parameters with a computer" in "any

old way you want." D.I. 28 at 65:14-16, 66:12-22.

But, even if "identifying" is construed, it would not provide an inventive concept. While

Ficep did not offer a construction during prior § 101 briefing (D.I. 30 at 16 n.6) and indicated it

would not seek any special construction (consistent with its claim construction position in prior

litigation, Ex. 2 at 7), before the PTAB it argued that "'identifying' intersection parameters does not encompass 'locating' pre-existing information, but instead includes analyzing data not already included in the design model to determine what the intersection parameters that define the intersection between components are." Ex. 1 at 16. This construction cannot be correct.

As explained above, the claims are silent as to how the "identification" step should be carried out by the "programmable logic controller." *See, e.g.*, D.I. 30 at 16. But the claims specify that the "identified" parameters are extracted "from the design model" after they are identified, so Ficep's contention that the identified information does not exist in the design model cannot be right. Pat. at 7:63-67, 8:43-47, 10:4-8. Moreover, the specification—"the single best guide to the meaning of a disputed term," *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (*en banc*)—explains that the invention is broad enough to encompass the "programmable logic controller" merely "copying or recording the intersection parameters and the original intersection parameters, and all the other data, which are present in the design model and are not lost." Pat. at 4:28-35. Indeed, the '719 patent makes clear that the information being identified and extracted is nothing new and has long been "included as part of existing computer aided designs." *Id.* at 2:2-5; *see also id.* at 1:17-25 (explaining that in the prior art, "computer-aided design model[s] include[] design specifications related to the structure or device, which include … welding characteristics, names of parts and components, dimensional references for squaring, and so forth"); *id.* at 5:17-26 (the design model "typically includes additional specifications, such as the dimensions of the individual components that make up the object and the way in which the individual components are mutually associated where they intersect"); *id.* at 6:63-67 ("Typically, all specifications associated with points of intersection between components, such as the male/female joint between two components, are included as part of the

design model."). And, although not binding here, the PTAB held that "'identifying' certain information encompasses 'locating' that information" and, likewise, "obtaining or copying intersection and manufacturing parameters from the design model is extracting those parameters from the model." D.I. 47-1 at 14 (citing Pat. at 4:28-34). Thus, the proper construction of "identifying" does not require "analyzing data not already included in the design model" as Ficep's proposed PTAB construction suggested. Rather, consistent with the claims, specification, and the PTAB's construction, "identifying" encompasses merely locating the intersection and manufacturing parameters that may already be contained in and copied from the design model.

But, even if accepted, Ficep's PTAB construction would not solve its ineligibility problem. Under Ficep's construction, the "identifying" term still fails to narrow the claim in a patentable way, because, by Ficep's admission, it preempts all ways of analyzing a design model short of a human taking the place of the computer. For example, Ficep has explained that under its construction "[a] human performing manual programming to add intersection parameters to a design model is not the invention" simply "because that is an example of the 'identifying' step being performed by the human," not a computer. Ex. 3 at 4. Ficep previously told the Court that its interpretation of the claims "capture[s] all the different possible ways in which a computer might" perform the "identifying" step. D.I. 28 at 67:21-68:12. And, even with Ficep's construction, the claims still amount to a "black box" that fail to "describe *how*" to identify the allegedly new intersection information, instead allowing the use of "*any* [identification] method." *Dropbox*, 815 F. App'x at 533; *Realtime Data*, 2021 WL 1752045, at *16. Therefore, even under Ficep's "identifying" construction, the claims would be ineligible under § 101.

## VI.   CONCLUSION

For the foregoing reasons, Peddinghaus respectfully requests that the Court grant summary judgment that the claims of the '719 patent are ineligible under § 101.

OF COUNSEL:

Stephanie P. Koh
John W. McBride
Jason P. Greenhut
Leif E. Peterson
SIDLEY AUSTIN LLP
One South Dearborn Street
Chicago, IL 60603
(312) 853-7000

Dated: July 7, 2021

*/s/ Kelly E. Farnan*

Kelly E. Farnan (#4395)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com

*Attorneys for Defendant Peddinghaus Corporation*

26