1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF DELAWARE

3

4      FICEP CORPORATION,              )
                                       )
5                     Plaintiff,       )
                                       ) C.A. No. 19-1994-RGA
6      v.                              )
                                       )
7      PEDDINGHAUS CORPORATION,        )
                                       )
8                     Defendant.       )

9
                                       J. Caleb Boggs Courthouse
10                                     844 North King Street
                                       Wilmington, Delaware
11
                                       Thursday, February 17, 2022
12                                     2:02 p.m.
                                       Oral Argument
13

14     BEFORE:  THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

15     APPEARANCES:

16               YOUNG CONAWAY STARGATT & TAYLOR, LLP
                 BY:  ADAM W. POFF, ESQUIRE
17               BY:  ROBERT M. VRANA, ESQUIRE

18                       -and-

19               FOLEY & LARDNER LLP
                 BY:  MATTHEW B. LOWRIE, ESQUIRE
20               BY:  KEVIN M. LITTMAN ESQUIRE

21                               For the Plaintiff

22

23               RICHARDS LAYTON & FINGER, P.A.
                 BY:  KELLY E. FARNAN, ESQUIRE

24                       -and-

25

| | |
|---|---|
| 1 | APPEARANCES CONTINUED: |
| 2 | SIDLEY AUSTIN LLP |
| | BY:  STEPHANIE P. KOH, ESQUIRE |
| 3 | BY:  LEIF PETERSON, II, ESQUIRE |
| 4 | For the Defendant |
| 5 | ***   PROCEEDINGS   *** |

02:01:57  6    DEPUTY CLERK:  All rise.  Court is now in

02:01:58  7  session.  The Honorable Richard G. Andrews presiding.

02:02:04  8    THE COURT:  All right.  Good afternoon.  Please

02:02:05  9  be seated.  This is *Ficep vs. Peddinghaus,* Number 19-1994.

02:02:18 10    And, Mr. Poff, you are the attorney for the

02:02:20 11  Plaintiff; right?

02:02:21 12    MR. POFF:  That's right, Your Honor.  Yes, Adam

02:02:25 13  Poff on behalf of Plaintiff, Ficep.  And with me from Young

02:02:30 14  Conaway is Robert Vrana.  And from counsel table from Foley

02:02:34 15  & Lardner, we have Matthew Lowrie and Kevin Littman.  And

02:02:38 16  then from Ficep, Tom Boyer, and Filippo Gremese.

02:02:44 17    THE COURT:  All right.  Thank you, Mr. Poff.

02:02:46 18    Ms. Farnan.

02:02:47 19    MS. FARNAN:  Good afternoon, Your Honor.  Kelly

02:02:53 20  Farnan from Richards Layton & Finger on behalf of the

02:02:56 21  Defendant, Peddinghaus.  I'm joined by my co-counsel from

02:02:58 22  Sidley Austin, Stephanie Koh and Leif Peterson.

02:03:01 23    THE COURT:  All right.  Thank you.

02:03:05 24    All right.  So, counsel who's arguing, when

02:03:07 25  you're arguing, you can take your mask off, if you want.

02:03:15 1    And, in fact, once I start talking a lot, I'll probably take

02:03:19 2    my mask off.

02:03:20 3              So, Ms. Koh, I guess it's your motion.

02:03:24 4              MS. KOH:  Yes, Your Honor.  Your Honor, can I

02:03:35 5    approach to hand out copies of the slides?

02:03:37 6              THE COURT:  Yes.  I will just say that I did

02:03:50 7    read the briefs.  I have looked at the patent and the

02:03:59 8    specification, and not that this really matters too much, I

02:04:02 9    also did look at the claim construction brief to just see

02:04:08 10   whether or not there was anything in the claim construction

02:04:11 11   brief that might affect this.  It seemed to be the answer to

02:04:13 12   that was no.

02:04:15 13             So, in any event, go ahead.

02:04:18 14             MS. KOH:  Your Honor, I agree.  I was going to

02:04:20 15   talk about claim construction.  I don't think there's

02:04:22 16   anything there that impacts the analysis.

02:04:23 17             The patent at issue here is about automating a

02:04:28 18   mental process using a generic computer.  And the patent

02:04:32 19   itself explains that in conventional systems a human

02:04:36 20   operator was required to identify, extract and then transfer

02:04:40 21   the data needed to manufacture parts from a computer design

02:04:45 22   file to a manufacturing machine.  And the patent replaces

02:04:48 23   that human operator with a generic black box computer.  And

02:04:54 24   that's what the claims are directed to, not any inventive

02:04:57 25   manufacturing process.

02:04:58  1          The focus of the claims isn't on manufacturing

02:05:02  2    physical objects, it's on the abstract idea of transferring

02:05:05  3    data.  And, importantly, the claims add nothing inventive or

02:05:10  4    specific to the process of creating a design model,

02:05:14  5    identifying and extracting figures from the design models or

02:05:18  6    to the machines used to manufacture the components of the

02:05:21  7    object.

02:05:22  8          In fact, the opposite is true.  The

02:05:24  9    specification states that any type of design model and any

02:05:27 10    standard assembly line manufacturing machine would do.  And

02:05:31 11    as the specification makes clear that the design model and

02:05:34 12    the manufacturing machines have long been known and are

02:05:37 13    conventional.  The patent never suggests that any advance

02:05:42 14    has been made to either of those conventional components.

02:05:45 15          And similarly, the programmable logic controller

02:05:48 16    is defined as any device capable of processing a design

02:05:52 17    model.  And neither the claims nor the specification say

02:05:55 18    anything about how the PLC operates to identify and extract

02:06:00 19    parameters from design models.  It's a black box.  This is a

02:06:05 20    quintessential do-it-on-a-computer patent that replaces what

02:06:08 21    a human admittedly did in conventional systems with a

02:06:12 22    completely unspecified generic computer.

02:06:16 23          The only reported advance of the invention over

02:06:19 24    admittedly conventional systems is automating the process of

02:06:23 25    converting data.  The patent says that eliminates the need

02:06:28 1    for human intervention, avoids operator error and improves

02:06:32 2    efficiency and accuracy.  These are the types of advantages

02:06:36 3    that are a telltale sign of an ineligible abstract idea.

02:06:39 4             If you take a look at Slide 2, it's just a

02:06:44 5    reminder, Ficep's patent narrowly survived at the motion to

02:06:48 6    dismiss stage.

02:06:49 7             THE COURT:  Yeah, yeah.  You don't need to

02:06:50 8    remind me about the history.

02:06:52 9             MS. KOH:  Sure.  The way that it survived was

02:06:54 10   that Ficep contended that the computer necessarily had to

02:06:57 11   perform differently than a human in identifying intersection

02:07:01 12   parameters.  And Ficep contended that claim construction was

02:07:04 13   necessary.  And I'd like to talk about both of those points

02:07:07 14   because we now have more information on both of those points

02:07:10 15   than we did at the motion to dismiss stage.

02:07:12 16            THE COURT:  Well, so, it would be more

02:07:15 17   helpful -- you know, it's not like I'm reviewing the

02:07:19 18   Magistrate Judge's decision or the arguments.  Time has

02:07:23 19   moved along.  We now have briefing on this motion.  So, it

02:07:31 20   would be more helpful to talk about the arguments they

02:07:34 21   actually make now than the arguments that they made before

02:07:38 22   the Magistrate Judge.

02:07:40 23            MS. KOH:  And I think, Your Honor, they're

02:07:41 24   making the same arguments, and they're just making them in

02:07:44 25   slightly different ways.  And now, they have two -- they

02:07:47  1   have an expert declaration and a declaration from their

02:07:50  2   president that they didn't have at the motion to dismiss

02:07:53  3   stage.  And if we take a look at Slide 4, they're really

02:07:57  4   making the same arguments that they did before.  They're now

02:08:00  5   saying they've had a chance to prove them up.  And what they

02:08:03  6   point to are these two declarations, and, for example, to

02:08:08  7   try to prove up their idea that this identifying step

02:08:12  8   necessarily created new information or that -- and it's a

02:08:16  9   little unclear whether they're using this under step one or

02:08:19 10   step two, that either the claims are directed to generating

02:08:24 11   new information that wasn't there before or that that

02:08:27 12   provides an inventive concept.  But all that they point to

02:08:30 13   are these extrinsic declarations that don't --

02:08:37 14        THE COURT:  Well, so you are on a motion for

02:08:39 15   summary judgment, so that --

02:08:39 16        MS. KOH:  We are here for motion for summary

02:08:39 17   judgment.

02:08:42 18        THE COURT:  -- they -- there's nothing wrong

02:08:43 19   with them pointing to extrinsic declarations; right?  You

02:08:48 20   know, maybe they don't prove anything or maybe they're

02:08:51 21   conclusory, but they can do it.

02:08:54 22        MS. KOH:  Absolutely, Your Honor.  But those

02:08:56 23   declarations don't raise a genuine dispute of material fact

02:09:00 24   regarding the eligibility of the claims.  So, if we look,

02:09:03 25   for example, at Slide 4, those declarations, all they do is

02:09:06 1   provide details about how the PLC might identify

02:09:10 2   intersection parameters in a way that's different than a

02:09:13 3   human process, on the bottom of the slide.  Critically,

02:09:16 4   those details aren't anywhere in the specification or the

02:09:18 5   claims, and we can talk about that in a minute.  But,

02:09:21 6   regardless, the declarations can't save this patent from

02:09:25 7   under 101 because they don't say that the PLC has to perform

02:09:30 8   the identifying step in any particular way whatsoever.

02:09:33 9   Their expert admits in his declaration -- his opinion is

02:09:36 10   that identifying in terms of iterative process, and he says

02:09:42 11   that's different than what a human would or could do

02:09:44 12   mentally.  But he says that that's not required for

02:09:47 13   identifying intersection parameters.

02:09:49 14            As you can see on the slide in Paragraph 18 of

02:09:52 15   the Chipman declaration, he says, I'm not opining that the

02:09:55 16   specifics below are necessarily required for identifying

02:09:58 17   intersection parameters.  He's offering what would be

02:10:02 18   understood to be a way of performing the process.

02:10:04 19            THE COURT:  So, actually, what do you understand

02:10:08 20   is meant by intersection parameters?  I envision that in its

02:10:14 21   simplest form, that you have two pieces of a thing to be

02:10:18 22   built, and they're going to be connected somehow.  And so, I

02:10:25 23   imagine intersection parameters have something to do with

02:10:29 24   like where on one piece or the other they're going to be

02:10:33 25   connected.

02:10:34  1              MS. KOH:  Correct, Your Honor.  And I think

02:10:36  2      there's some confusion in the briefing on this.  Ficep

02:10:39  3      appears to argue that an intersection parameter has to

02:10:43  4      involve drawing a line or making a marking for where two

02:10:50  5      parts would meet each other in a -- you can picture a design

02:10:53  6      model of a building where you have two beams coming

02:10:56  7      together.  They seem to suggest that intersection parameters

02:10:58  8      have to involve scribing or marking.  But if you look at the

02:11:02  9      patent, it's much more along the lines of what Your Honor

02:11:05 10      says.

02:11:08 11              And actually, if we turn to --

02:11:15 12              THE COURT:  I think --

02:11:16 13              MS. KOH:  -- Slide 12.

02:11:17 14              THE COURT:  -- you put it in your brief.  There

02:11:20 15      is some very general statement, I think.

02:11:23 16              MS. KOH:  Yes, yes.  The parameters -- in

02:11:25 17      Column 4 of the patent, it states that the parameters

02:11:27 18      associated, for instance, with the cross arms.  So, you

02:11:30 19      know, a cross arm connecting two beams.  Distance from the

02:11:35 20      floor.  Bolts fixing point.  The point of support of the

02:11:38 21      beam, et cetera, are intersection and or manufacturing

02:11:41 22      parameters.

02:11:41 23              So, a manufacturing machine punching a bolt in a

02:11:47 24      bolt hole in a specific location is manufacturing that part,

02:11:51 25      based, at least in part, on an intersection parameter.  The

02:11:54 1    bolt hole is defining an intersection parameter.  That's

02:11:57 2    where a part will connect and be bolted together.

02:12:00 3          So, the notion that an intersection parameter is

02:12:03 4    necessarily a line or a scribed line, that's not supported

02:12:07 5    by the patent at all.  The patent is -- the intersection

02:12:09 6    parameters are much broader than that.  And the claim

02:12:18 7    construction on Slide 7, we put the key parts of the claim

02:12:23 8    construction brief.  Intersection parameters, Ficep says it

02:12:26 9    shouldn't even be construed at all.  It's just plain and

02:12:30 10   ordinary meaning.  They're not limiting intersection

02:12:32 11   parameters in any particular way to any particular type of

02:12:35 12   parameter.  And certainly, a bolt hole, a bolt in fixing

02:12:39 13   location, all of those things are intersection parameters

02:12:42 14   within the scope of the patent.

02:12:44 15         So, going back to what their expert says about

02:12:50 16   the iterative process of identifying intersection

02:12:55 17   parameters, he says that iterative process is not required.

02:12:59 18   It doesn't put any limitation on how the computer can do it.

02:13:02 19   All ways of identifying intersection parameters are covered

02:13:07 20   as long as it's not -- as long as a computer takes the place

02:13:11 21   of a human.  And that's exactly the type of preemption

02:13:14 22   issues Section 101 was designed to avoid.

02:13:17 23         And, again, if we look at what was proposed by

02:13:19 24   Ficep in claim construction for identifying a plurality of

02:13:23 25   intersection of manufacturing parameters --

02:13:26  1                    THE COURT:  Which is essentially --

02:13:26  2                    MS. KOH:  Right.  It just says identifying

02:13:28  3    without human intervention.

02:13:29  4                    THE COURT:  Right.

02:13:30  5                    MS. KOH:  Ficep has criticized Peddinghaus for

02:13:41  6    allegedly failing to come forward with evidence on summary

02:13:43  7    judgment.  I wanted to touch on that, Your Honor.  We have

02:13:45  8    offered the most compelling evidence of all which is the

02:13:48  9    patent itself.  The Federal Circuit repeatedly has stated

02:13:51 10    that the key piece of evidence for doing an eligibility

02:13:56 11    analysis is the patent itself.  It's step one.  We're

02:13:58 12    supposed to focus on what is the focus of the claims, what

02:14:01 13    are the claims directed to.

02:14:03 14                    And in step two we're supposed to look at:  Is

02:14:05 15    there an inventive concept in the claims themselves?  The

02:14:10 16    patent is all the evidence that we needed.  And the patent

02:14:13 17    says nothing about how the identifying step is performed.

02:14:17 18    And the patent contradicts Ficep's arguments that

02:14:20 19    intersection parameters have to be new information or that

02:14:22 20    they have to be a scribed line.  And the patent contradicts

02:14:28 21    Ficep's argument that those intersection parameters were

02:14:32 22    never done in the manual process.  The patent repeatedly

02:14:37 23    talks about the intersection parameters coming from the

02:14:40 24    design model.

02:14:42 25                    And if we take a look at Slide 6, Your Honor,

02:14:46 1   the Background section of the patent, this is a quote from

02:14:51 2   their claim construction brief, the joint claim construction

02:14:54 3   brief at eight.  They seem to suggest that a human operator

02:15:00 4   couldn't identify intersection parameters, couldn't input

02:15:05 5   intersection parameters and have a machine make marks, even

02:15:09 6   if that was what was required, and we don't think it is.

02:15:12 7           Here's a quote from their portion of the joint

02:15:15 8   claim construction brief.  The patent explains that a

02:15:18 9   problem arises when the specialized human operator capable

02:15:21 10  of inputting data into the manufacturing machine is

02:15:23 11  unavailable.  And then they explain that that specialized

02:15:26 12  human operator is a human who can translate the CAD drawing

02:15:30 13  into the instructions that program the machine on where to

02:15:33 14  make marks.

02:15:33 15          So, even if making marks was required, which it

02:15:36 16  isn't as we just talked about, they've admitted that the

02:15:39 17  specialized human operator in the conventional process could

02:15:42 18  translate the CAD drawing into instructions for a machine to

02:15:46 19  make marks.  All they've done is automate that process with

02:15:50 20  an absolutely generic computer that's not limited in any way

02:15:54 21  that preempts all ways in which a computer could translate

02:15:58 22  this data from a CAD model to a manufacturing machine.

02:16:01 23          At Alice step one, Your Honor, the claims are

02:16:13 24  directed to an abstract idea.  That is absolutely the focus

02:16:18 25  of the claims.  That is what is said to be the advance.

02:16:23 1          THE COURT:  So, you know, one of the problems or

02:16:26 2    one of the issues with the abstract idea is getting it at

02:16:31 3    the right level of, you know, not too high level and not too

02:16:40 4    low level.  Now, that you have plenty of time to think about

02:16:46 5    it, what would you say the abstract idea is here?  You

02:16:51 6    mentioned when you started transferring data, but that seems

02:16:55 7    to me to be a high-level subbing of something.

02:17:00 8          What is your final answer, so to speak?

02:17:03 9          MS. KOH:  I think our final answer, Your Honor,

02:17:05 10   is that the abstract idea is identifying, extracting and

02:17:10 11   transferring data from a computerized design model of an

02:17:14 12   object to a manufacturing machine.  The patent admits that

02:17:18 13   that that's a known process.  Humans did it.  That is what

02:17:23 14   the focus is.  The abstract idea is identifying, abstracting

02:17:28 15   and transferring data from the design model to a

02:17:30 16   manufacturing machine.

02:17:32 17         And the claims accomplish that with a generic

02:17:36 18   computer.  But the focus of the claims is on that process of

02:17:42 19   identifying, extracting and transferring data from the

02:17:45 20   design model of the machine.  And that's been done.  That is

02:17:50 21   a very, very conventional abstract idea looking at a design.

02:17:57 22   Like Your Honor said, there's a design of a building, a

02:17:59 23   design of a part.  Figuring out where the parts intersect,

02:18:03 24   figuring out how long the different parts are and then

02:18:06 25   programming them into the manufacturing machine to implement

02:18:09 1    that accordingly.

02:18:10 2              Really here computerized automation is the only

02:18:12 3    alleged advance over the prior art that's described in the

02:18:16 4    specification or in the claims.  The focus is on the

02:18:19 5    abstract idea at step one.

02:18:21 6              THE COURT:  One of the things that I expect to

02:18:26 7    hear from your opponent is, I think, that there's something

02:18:37 8    inventive about these intersection parameters.  What is your

02:18:46 9    response to that?

02:18:48 10             MS. KOH:  So, Your Honor, certainly if

02:18:51 11   intersection parameters are, they don't limit it to any

02:18:55 12   particular type of intersection parameters, as we talked

02:18:57 13   about.  So, certainly, and we think the specification is

02:19:00 14   clear that the intersection parameters cover things like

02:19:03 15   bolt holes.  There's certainly nothing inventive or unique

02:19:07 16   about programming a machine to have a bolt hole at a

02:19:10 17   particular location.

02:19:12 18             But even if I think where they tried to say that

02:19:17 19   the intersection parameters are, you know, lines, markings

02:19:24 20   scribing on one piece of equipment where -- on a piece of

02:19:28 21   material where another piece would connect, even that,

02:19:34 22   again, is not an inventive or novel type of intersection

02:19:37 23   parameter.

02:19:38 24             They admit that specialized human operators

02:19:41 25   translated CAD drawings and programmed machines on where to

02:19:45  1    make marks.  We just looked at that.

02:19:47  2              The claims aren't directed to a new kind of

02:19:53  3    intersection parameter.  That's not the focus of the claims.

02:19:58  4    That's not the focus of the specification.  And if we look

02:20:01  5    at the specification, a wide variety of things are said to

02:20:06  6    be intersection parameters, and they're all said to be in

02:20:08  7    existing CAD models, which is important.

02:20:12  8              Ficep admits that the design models that are

02:20:16  9    used in the prior art process are the same as the ones that

02:20:19 10    are used in the automatic one.  They admitted that actually

02:20:22 11    in Footnote 10 of their claim construction brief.  But the

02:20:26 12    patent itself makes clear the computer-aided design models

02:20:30 13    long included information about intersection parameters.

02:20:33 14    They weren't the first to come up with this idea.

02:20:36 15              Column 1 of the patent talks about a

02:20:38 16    computer-aided design model, includes design specifications

02:20:41 17    related to the structure or device which include, for

02:20:45 18    example, among others, welding characteristics, name of

02:20:48 19    parts and components, dimensional references for squaring

02:20:52 20    and so forth, welding characteristics, dimensional

02:20:54 21    references for squaring.  Those would be intersection

02:20:57 22    parameters.

02:20:58 23              THE COURT:  And I'm sorry, Ms. Koh -- oh, yeah,

02:21:00 24    yeah.  Hold on a minute.

02:21:21 25              All right.  Go ahead.

02:21:22 1          MS. KOH:  Another example, Your Honor, is in

02:21:24 2     Column 4, maybe I'll give you a line number to help orient

02:21:27 3     us, apologies for not doing that.  Column 4 starting at

02:21:32 4     around Line 12, the patent talks about intersection and

02:21:35 5     manufacturing parameters are generally associated with an

02:21:38 6     intersection or association of any two or more components

02:21:41 7     that make up an object.  The patent is not suggesting that

02:21:43 8     the patent is the first one that has come up with the idea

02:21:46 9     that components intersect.

02:21:48 10          And then it goes on in Line 19 of Column 4, it

02:21:51 11    talks about the point at which the pillar intersects the

02:21:55 12    beam.  That is to say the point where the cross arms should

02:21:57 13    be installed is an intersection point.  The intersection

02:21:59 14    and/or manufacturing parameters define this intersection

02:22:02 15    point and the manufacturing to be performed.  It doesn't

02:22:06 16    require marking a line.  It doesn't require scribing a line.

02:22:09 17    That's not what this patent says they invented.

02:22:12 18          THE COURT:  And part of what you're saying here,

02:22:14 19    which seems to possibly be relatively close to the heart of

02:22:19 20    the matter, is that basically the patent talks about

02:22:28 21    intersection points, at a minimum, as if everyone actually

02:22:36 22    understands what these things are already.  And, therefore,

02:22:43 23    when they have their earlier discussion about the

02:22:48 24    specification, it talks about when humans were involved in

02:22:56 25    this and were taking the information from the CAD drawing

02:23:01 1   and, you know, using it on the assembly line or whatever.

02:23:07 2   The information that they were taking included all the

02:23:15 3   manufacturing things of interest, which would include where

02:23:19 4   the two things fit together.  And that's kind of the

02:23:26 5   argument that you have as to why in the end it's just this

02:23:31 6   is a computer doing what humans used to do; right?

02:23:38 7         MS. KOH:  Yes, Your Honor.  I agree with

02:23:40 8   everything that you just said.  That's exactly right.

02:23:42 9         THE COURT:  So, you know, one of the things that

02:23:51 10   the Federal Circuit has said more than once is that, you

02:23:58 11   know, the best way to decide these things is to find the

02:24:01 12   closest previous case, I guess on either side and, you know,

02:24:12 13   compare to see whether this is like the ones where they've

02:24:15 14   said not eligible or this is like the ones where they said

02:24:19 15   eligible.

02:24:20 16         So, what is your best case?  My preference is

02:24:27 17   for a reported Federal Circuit decision.

02:24:31 18         MS. KOH:  So, Your Honor, I think that if we're

02:24:34 19   looking for the best case that describes the same type of

02:24:40 20   abstract idea, the notion of identifying, extracting and

02:24:46 21   transferring information, I think that's the University of

02:24:50 22   Florida case.  But I actually think that the Yu case which

02:24:57 23   we cited in our briefs, and I can get you the cite --

02:24:59 24         THE COURT:  I know what you're talking about.

02:25:01 25         MS. KOH:   I think that that case is actually

02:25:04  1    very analogous.

02:25:05  2              THE COURT:  That's the camera case?

02:25:05  3              MS. KOH:  What?

02:25:06  4              THE COURT:  That's the camera case?

02:25:08  5              MS. KOH:  The camera case.  And I think that

02:25:09  6    that case is very analogous to responding to the arguments

02:25:13  7    that Ficep is making here.

02:25:14  8              So, one of their arguments is this can't be an

02:25:17  9    abstract idea.  It's happening in the real world.  There's

02:25:20  10   real-world parts.  You had a physical device, real-world

02:25:23  11   part.  It's a digital camera.

02:25:24  12             Part of what they're saying is that a human --

02:25:33  13   the computer necessarily had to perform differently than a

02:25:36  14   human.  And I think it's a little bit of a sideshow, but in

02:25:41  15   Yu, there was really no question that a photographer

02:25:46  16   enhancing two images together is not going to perform that

02:25:49  17   process in the same way as the digital camera is going to

02:25:52  18   perform the process.

02:25:53  19             The Federal Circuit didn't focus on that.  That

02:25:55  20   didn't matter.  What mattered is that there was no

02:25:57  21   implementation details at all in those claims.  They were

02:26:01  22   completely generic.  They were trying to preempt the entire

02:26:04  23   idea of one image enhancing another.  And in Yu, there were

02:26:09  24   details in the specification.

02:26:11  25             Here, we don't even have that.  We don't even

02:26:13 1   have the details in the specification.

02:26:14 2               But in Yu, the Federal Circuit said, without any

02:26:18 3   details in the claims, the focus should be on the claims.

02:26:21 4   And without any details in the claims, that cannot survive

02:26:25 5   eligibility.  So, I actually think Yu is very instructive

02:26:28 6   here, even though the abstract idea is a little bit

02:26:31 7   different.

02:26:32 8               THE COURT:  And remind me, because when I first

02:26:35 9   saw Yu, it was a District Court case.  But it went to the

02:26:39 10  Federal Circuit and I think affirmed.  Is it affirmed in a

02:26:43 11  published opinion or a non-precedential opinion?

02:26:47 12              MS. KOH:  Can I just go grab the binder that has

02:26:51 13  Yu in it off the table, and I'll tell you?

02:26:55 14              THE COURT:  Yes.

02:26:55 15              MR. LOWRIE:  It is published, Your Honor.

02:26:57 16              THE COURT:  Okay.  Thank you.

02:27:01 17              MS. KOH:  1 F.4th 1040 --

02:27:03 18              THE COURT:  Yeah, I don't need the cite.  I

02:27:05 19  just, you know, in the world of the Federal Circuit, their

02:27:12 20  published opinions are a lot more useful than their

02:27:14 21  non-precedential opinions.

02:27:16 22              MS. KOH:  Correct.  Correct.

02:27:17 23              THE COURT:  And probably more involvement goes

02:27:21 24  into the case.

02:27:22 25              All right.  Is there anything important that you

```
02:27:25  1    haven't said that you want to say?
02:27:26  2              MS. KOH:  I think we've covered it, Your Honor.
02:27:30  3    You know, I don't -- we didn't go through the components in
02:27:33  4    the claims, but, obviously, from our briefs you understand
02:27:36  5    our position is those components are completely generic.
02:27:38  6    The claims don't provide any details or limitations as to
02:27:41  7    how any of those generic components function.  The claim is
02:27:46  8    directed to an abstract idea, and there's nothing in the
02:27:49  9    claim at Step 2 that saves it and makes it patent eligible.
02:27:54 10              THE COURT:  Okay.  Thank you.
02:27:57 11              MS. KOH:  Thank you, Your Honor.
02:28:08 12              THE COURT:  Sorry.
02:28:09 13              MR. LOWRIE:  Not at all, Your Honor.
02:28:22 14              THE COURT:  Yeah.  Go ahead.  Sorry.
02:28:24 15              MR. LOWRIE:  Thank you, Your Honor.  Thank you.
02:28:25 16    No, no.  I just don't want to interrupt a thought.
02:28:29 17              So, do we have the slides to be handed up?
02:28:57 18              May it please the Court, Matt Lowrie from Foley
02:29:01 19    & Lardner.  I think we were able to project the slides, but
02:29:03 20    I think, to keep it equal, we're not going to.
02:29:06 21              THE COURT:  Yeah, I don't think we need to do
02:29:08 22    projecting.
02:29:09 23              MR. LOWRIE:  No.  So, if we go to Slide 2, it's
02:29:11 24    just an overview, and we'll get there.  If we start with
02:29:15 25    posture, I don't want to spend -- I'd be happy to spend, but
```

02:29:19  1    I don't think Your Honor wants to spend a lot of time on it.

02:29:21  2    It's not worthwhile.

02:29:22  3            But we have the same record here as we did at

02:29:24  4    the motion to dismiss, which was denied.  And I don't think

02:29:28  5    that was a mistake to have the case keep going.  It may have

02:29:32  6    been a mistake not to have any factual involvement by the

02:29:34  7    party who has the burden of proof.

02:29:35  8            If we go to Slide 2 -- Slide 4, this is Figure 2

02:29:40  9    from the patent.

02:29:41 10            THE COURT:  Well, so actually, while we're

02:29:42 11    talking about the Magistrate Judge's decision, if I recall

02:29:46 12    correctly, and honestly, I didn't reread it for today's

02:29:52 13    proceedings, he said Plaintiff is saying claim construction.

02:30:00 14    He even said it in his brief which was written six months or

02:30:03 15    so before you actually did claim construction.

02:30:05 16            But don't you agree that claim construction has

02:30:08 17    dropped out of the case as an issue relevant to the

02:30:12 18    eligibility decision?

02:30:13 19            MR. LOWRIE:  Not exactly, Your Honor.  And the

02:30:15 20    two issues I would point to, the first would be one that was

02:30:18 21    brought up in the argument here today, that intersection

02:30:22 22    parameters can be anything.  It can be a hole.  It can be

02:30:24 23    this.  It can be that.

02:30:25 24            If Your Honor looks at claim 7, it says

02:30:28 25    intersection parameters which define the intersection.  I'm

02:30:32  1    sorry, but a hole does not define an intersection.  And so,

02:30:35  2    that is the claim language of the claim.  I think we've

02:30:38  3    proposed that it be interpreted as the claim language of the

02:30:41  4    claim.

02:30:41  5              THE COURT:  But that's not claim construction.

02:30:43  6    That's just, it's the claim.

02:30:45  7              MR. LOWRIE:  It's not claim construction unless

02:30:47  8    one accepts Peddinghaus' argument that intersection

02:30:49  9    parameters in claim 7 is something broader than intersection

02:30:53 10    parameters which define the intersection.  See, that's my

02:30:57 11    point, Your Honor.  I mean, that is an issue --

02:30:57 12              THE COURT:  No, I --

02:30:59 13              MR. LOWRIE:  It's a difference in claim scope.

02:31:01 14    I think Peddinghaus made perhaps an incorrect statement

02:31:03 15    about the scope of the claim, but that is claim scope and,

02:31:06 16    therefore, Markman.

02:31:07 17              The other would be this idea that identifying

02:31:10 18    intersection parameters includes just going into the model

02:31:14 19    and pulling them out of the model.  And there's been a huge

02:31:19 20    cloud cast over that.  I'll address it in my slides.

02:31:21 21              But to sum it up, it wasn't in the model.  It

02:31:25 22    had -- the model has information from which you could

02:31:28 23    derive -- we're talking prior art.  The model has

02:31:30 24    information from which you can derive it, but the shape of

02:31:34 25    the intersection, something that defines the intersection is

02:31:36  1    not as such existing in the model.  You have to determine

02:31:40  2    it.

02:31:40  3              And that's in the affidavits or declarations

02:31:44  4    that are attached to the briefing here.  I'll talk about it

02:31:47  5    in the context of the patent.

02:31:48  6              And so, when Peddinghaus says, identifying means

02:31:54  7    locating, they're setting it up in a way that wouldn't work

02:31:57  8    in the prior art, because the prior art you couldn't locate

02:32:01  9    them.  Now, identifying could be broader than that, and it

02:32:05 10    was because you have to derive them in the prior art, which

02:32:07 11    is what happened and why this was a big deal because nobody

02:32:10 12    was doing that before.  So, but again, it's a claim

02:32:14 13    construction --

02:32:14 14              THE COURT:  So, you're saying that identifying

02:32:17 15    parameters means something different than identify

02:32:21 16    parameters?

02:32:21 17              MR. LOWRIE:  No, Your Honor.  I'm saying it

02:32:23 18    covers going in and deriving them or identifying them.  It's

02:32:27 19    just prior art.  They weren't there to go in and find

02:32:30 20    without more.  One had to do computations, and Mr. Chipman

02:32:35 21    says, There are a number of ways you can do it.  None of

02:32:37 22    them look anything like what a human would do.  But this is,

02:32:41 23    you know, you would know.  If you wrote CAD computer

02:32:45 24    programs, you would know how to go in and calculate what the

02:32:49 25    parameters are that define the intersection.  Not just a

02:32:53  1    hole can be intersection parameters.  Sure, it can, but a

02:32:57  2    hole without more is not going to define an intersection.

02:33:00  3            And so, it's one of these issues where I don't

02:33:05  4    know that it really has to be resolved for 101 because I

02:33:09  5    think it -- 101 should be denied before Your Honor gets

02:33:12  6    there.  But that is an argument that Peddinghaus has

02:33:16  7    advanced in favor of 101, which is the part that was

02:33:19  8    Markman.

02:33:20  9            The other part of the Magistrate Judge or I

02:33:22 10    should say Judge Burke's decision was simply there's a fact

02:33:25 11    issue as to what was conventional.  There's a fact issue

02:33:29 12    potentially based on what was in the pleadings.

02:33:31 13            What we have now is a full set of evidence,

02:33:35 14    declarations that establishes what's in the pleadings and

02:33:39 15    not a drop for the Court to support that anything's

02:33:42 16    conventional.  I'll get to what's in the patent in a minute,

02:33:45 17    but that does not do much for step two.

02:33:49 18            I do remember Judge Burke asked me at the

02:33:52 19    hearing, What do you think is stronger step one or step two?

02:33:54 20    And I said, I think they're both really good.  When I

02:33:57 21    initially wrote the brief, I might have thought step two.

02:33:59 22    Looking at the case law now, I think maybe step one.  And

02:34:02 23    that's in front of Your Honor, too, and I'll talk about why

02:34:06 24    because that's the case law.  I won't belabor the point.

02:34:09 25            If we return, Your Honor, to Slide 4, though, I

02:34:13   1   just want to set the setting for what's happening here.

02:34:15   2   Here's a drawing.  It's Figure 2 of the patent.  A person of

02:34:20   3   ordinary skill in the art would know what these things are.

02:34:22   4   On the left is a laptop and on the right is a scribing

02:34:25   5   machine.  And you look at this figure and you think that's

02:34:27   6   some small thing, but a person of ordinary skill in the art,

02:34:31   7   as established by the evidence in front of Your Honor now,

02:34:34   8   would know that that's a scribing machine which is something

02:34:37   9   that's the size of a car or even a pickup truck.  It's not

02:34:41  10   the size of a laptop.

02:34:42  11            THE COURT:  But what difference does that make

02:34:44  12   because what's important is what the claims are, and the

02:34:49  13   claims are much broader than that; right?

02:34:53  14            MR. LOWRIE:  They are broader than that, but the

02:34:55  15   claims and the invention for 101 purposes have a context.

02:34:59  16   And the context of that is a system on the front page, and

02:35:04  17   I'll get to more about this, too.  But on the front page is

02:35:06  18   a system that has a scribing machine that is a manufacturing

02:35:11  19   machine.  I mean, people seem to say or Peddinghaus says,

02:35:14  20   This is just any machine.

02:35:16  21            No, it's a manufacturing machine.  That's a

02:35:18  22   thing, right.  And manufacturing machines in this setting --

02:35:21  23            THE COURT:  Right.  Manufacturing machine,

02:35:22  24   according to the specification, is like an electronic tool,

02:35:26  25   that tool that does something.

02:35:27  1                    MR. LOWRIE:  Right.  But the examples that are

02:35:29  2     provided and the only systems where this has ever seen an

02:35:32  3     application are in the context of big manufacturing machines

02:35:37  4     specifically for steel buildings.  So, if I could just --

02:35:39  5                    THE COURT:  But --

02:35:40  6                    MR. LOWRIE:  Yes, Your Honor.

02:35:41  7                    THE COURT:  I don't understand what you mean

02:35:53  8     when you say well, the only context that this has ever

02:35:56  9     occurred in is big steel buildings.  There's nothing about

02:36:00 10     the claims that are directed to big steel buildings; right?

02:36:04 11                    MR. LOWRIE:  There is nothing that's expressly

02:36:07 12     directed there.  The way this is played out, Your Honor,

02:36:09 13     both before and after the patent, is that the only

02:36:12 14     application for this technology is that setting.

02:36:15 15                    So, all of the prior --

02:36:17 16                    THE COURT:  To some extent that suggests that --

02:36:26 17     well, does that suggest that when Defendant says preemption,

02:36:32 18     the Defendant has a point because the way it's written it

02:36:37 19     covers -- I mean, I was going to ask you:  Doesn't it really

02:36:42 20     cover any computer-assisted drawing that goes to a machine

02:36:50 21     that then helps build something?

02:36:53 22                    MR. LOWRIE:  Not even remotely.  It would

02:36:55 23     require, and I'll get to the definition at the end of the

02:36:57 24     slides, too, but it requires not just the manufacturing

02:36:59 25     machine, but there has to be a CAD diagram of a

02:37:02  1    multi-component object where the components intersect.  And

02:37:06  2    you need to determine --

02:37:07  3            THE COURT:  Well, isn't any multi-component

02:37:09  4    object going to have an intersection?

02:37:11  5            MR. LOWRIE:  Not necessarily.  And it's not

02:37:14  6    necessarily going to be made on a manufacturing piece.  It's

02:37:18  7    not necessarily going to be made component by component.

02:37:21  8    This is a -- and I don't even know that it would typically

02:37:24  9    have a CAD drawing associated with it, depending on what

02:37:27 10    we're talking about.  Right.  I think most things are not

02:37:29 11    designed that way.

02:37:31 12            And so, you wouldn't have something from which

02:37:32 13    you could derive intersection parameters.  But, again --

02:37:38 14            THE COURT:  Well, anything that you manufacture

02:37:40 15    based on a CAD drawing seems inconceivable to me that it

02:37:47 16    doesn't have intersection parameters.

02:37:49 17            MR. LOWRIE:  It may.  Whether they would be

02:37:51 18    useful to take into account in the manufacturing process,

02:37:55 19    the answer I think in most settings is no.

02:37:58 20            THE COURT:  But is there a requirement that it

02:38:00 21    be useful?

02:38:01 22            MR. LOWRIE:  I think part of what we're looking

02:38:04 23    at in 101 is usefulness.  And in the context of this patent,

02:38:08 24    the way the invention was made, the prior art for the

02:38:11 25    patent, all of the acts of infringement ever since, this is

02:38:14 1    the context.  And I think the Court can look at the context

02:38:17 2    of where this patent was and is being applied when deciding

02:38:22 3    Section 101 issues.

02:38:23 4            I mean, is this in the real world or is it not?

02:38:26 5    How has it been done?  What is the application of this?  I

02:38:29 6    think that that's fair for the Court to consider, and I

02:38:32 7    think actually the case law sort of does that.  I mean,

02:38:34 8    they're looking in the claim, but they're looking in the

02:38:37 9    claim at things at an even higher level of detail.

02:38:40 10           For example, if we look at the Thales case,

02:38:43 11   T-H-A-L-E-S, it has two sensors and it uses a reference.

02:38:50 12   One of them is a reference and the other is on here, and

02:38:53 13   you're going to determine -- you're going to track the

02:38:55 14   movement of the reference based on what you're seeing on

02:38:58 15   these two sensors.  Right.

02:38:59 16           Now, I have two eyeballs that can do that, also,

02:39:02 17   but that was not an abstract idea in the Federal Circuit's

02:39:05 18   mind in the published decision.  Right.  I mean, what is the

02:39:08 19   setting for this?  And the setting for this was the real

02:39:10 20   world of kind of like a GPS plotting a route or whatever.

02:39:14 21   This is in the real world where we're doing something real.

02:39:17 22           And so, I think the question here is:  Are we in

02:39:19 23   the real world doing something real in this claim?  And I

02:39:22 24   think the answer there is plainly.  I mean, we're

02:39:25 25   manufacturing something, and we're manufacturing it in a

02:39:28 1   different way to produce a different object than had ever

02:39:32 2   been done before.

02:39:33 3            And if I was wrong about that, I think we'd know

02:39:38 4   it because we've been through a first litigation that went

02:39:41 5   through summary judgment, an inter partes review from

02:39:44 6   Peddinghaus, and now at least validity contentions in this

02:39:46 7   case.  And I have yet to see the prior art that does it.

02:39:49 8            And what we have, what the Court has as evidence

02:39:52 9   is just the declarations of Mr. Colombo and Mr. Chipman

02:39:56 10  which says that's not something that's ever been done in the

02:39:59 11  past.

02:39:59 12           THE COURT:  Well, of course, doing things on a

02:40:03 13  computer are things that haven't been done in the past, when

02:40:07 14  you have patents that make that claim.

02:40:11 15           MR. LOWRIE:  Yes, and that's been held out here,

02:40:14 16  but this patent is not about doing something on a computer.

02:40:17 17  This patent is about making a component of a multi-component

02:40:22 18  object based on intersection parameters that were derived by

02:40:26 19  a computer.

02:40:27 20           So, if Your Honor were to --

02:40:30 21           THE COURT:  Actually, so just going back to that

02:40:34 22  question or related to that question, the patent has 14

02:40:43 23  claims, three independent claims.  Are you asserting all 14

02:40:48 24  claims at this point?

02:40:49 25           MR. LOWRIE:  I don't think it's all 14.

02:40:53  1    Peddinghaus has identified claim 7 as what they call

02:40:56  2    representative.  There are some dependent claims that might

02:40:59  3    be different.  I don't have -- I can get a list, I'm sure,

02:41:02  4    of which claims are --

02:41:03  5            THE COURT:  Well, I mean, do you know whether

02:41:08  6    you are asserting anything that's related to independent

02:41:13  7    claim 1 and independent claim from it, a method claim?

02:41:18  8            MR. LOWRIE:  Well, for example, I know that the

02:41:20  9    way that intersection parameters is described --

02:41:23 10            THE COURT:  No, no, no.

02:41:24 11            MR. LOWRIE:  Oh, I'm sorry.

02:41:25 12            THE COURT:  Are you asserting it?

02:41:27 13            MR. LOWRIE:  Oh, yeah, yeah, yeah, for sure.

02:41:29 14    Yes, I know we're asserting multiple claims.

02:41:31 15            THE COURT:  All right.  But you know that --

02:41:33 16            MR. LOWRIE:  Some are method claims and some are

02:41:36 17    apparatuses.

02:41:36 18            THE COURT:  Okay.  Thank you.

02:41:37 19            MR. LOWRIE:  Yes, I'm sorry.  I misunderstood

02:41:40 20    Your Honor.

02:41:41 21            If I could, what we have in the slides kind of 5

02:41:50 22    through 14 are essentially what was found to infringe from

02:41:55 23    Voortman's machine.  And the reason I did that is because

02:41:57 24    there is a summary judgment finding of infringement, and

02:41:59 25    there was a video of that on the Internet, so it was easy to

02:42:03  1    clip.

02:42:03  2            But here what's happening in an application

02:42:06  3    of -- this is on Slide 6.  You have -- Slide 5, you have

02:42:12  4    this giant facility and it marks out kind of on the outside

02:42:15  5    of the building where the components are.  And then Slide 6

02:42:19  6    shows a giant assembly line.  The shotblaster takes an

02:42:23  7    I-beam generally and polishes the rust off it.  It moves

02:42:27  8    over to the saw which cuts to length.

02:42:30  9            Now, these are dimensions, Your Honor.  And

02:42:32 10    these are things where a skilled human operator would look

02:42:35 11    at the dimensions and cut the beam or tell the machine where

02:42:39 12    to cut the beam to make it the correct length.

02:42:41 13            There's a drill that would make holes and then

02:42:45 14    the couper is something that was a plasma scribing and it

02:42:50 15    could be used to scribing things like a part number onto the

02:42:53 16    beam.  Slide 7 is a fab line.  Slide 8 is the CAD models.

02:43:00 17    Slide 9 is an image of that.

02:43:03 18            Identifying and extracting intersection

02:43:05 19    parameters, again, that's something that I've worked with,

02:43:09 20    CAD design.  I know that you could derive it, but you

02:43:11 21    wouldn't necessarily do it.  And, in fact, the prior art,

02:43:14 22    they weren't doing it, and that's part of what makes this

02:43:18 23    definition different.

02:43:19 24            THE COURT:  Is there anything in the patent

02:43:25 25    about that that there's something different about the way

02:43:30  1        they were using intersection parameters?

02:43:32  2                    MR. LOWRIE:  So, yes.  If we could go to Slide

02:43:39  3        15, Your Honor.

02:43:41  4                    THE COURT:  Okay.

02:43:42  5                    MR. LOWRIE:  This actually has on the slide the

02:43:44  6        part of the patent where Peddinghaus says, This shows we're

02:43:51  7        just automating something that was being done before.  And

02:43:54  8        that's not what it says.

02:43:57  9                    So, has Your Honor found Slide 15?

02:44:01 10                    THE COURT:  I've got Slide 15.  I've got the

02:44:04 11        patent.

02:44:04 12                    MR. LOWRIE:  Okay.  Great.  And so, it starts by

02:44:06 13        saying --

02:44:06 14                    THE COURT:  What column or line is this?

02:44:08 15                    MR. LOWRIE:  It's the one on 15, and it's

02:44:20 16        Column 1, Line 26.  Almost to the end, almost to the Objects

02:44:26 17        of the Invention.

02:44:27 18                    THE COURT:  So, this is the prior art?

02:44:30 19                    MR. LOWRIE:  Well, or background any way.

02:44:34 20        People don't like to mention prior art.  It doesn't really

02:44:35 21        matter here.

02:44:37 22                    And it says in order to complete the

02:44:39 23        manufacturing process, a human operator typically must

02:44:43 24        program manually the manufacturing machines.  Okay.  There's

02:44:47 25        no mention yet of intersection parameters.  And, in fact, if

02:44:50  1    Your Honor looks at the claims, they talk about extracting

02:44:53  2    the dimensions.  And that was something that was done,

02:44:55  3    extracting dimensions like the length of the I-beam.

02:44:59  4              Then it goes on, the next paragraph, and says

02:45:02  5    because the design specifications indicated in a display

02:45:06  6    must be passed manually by a human operator to the automated

02:45:10  7    assembly line equipment for manufacture.  And then it talks

02:45:13  8    about the problem.

02:45:15  9              It's after talking about that problem that it

02:45:18 10    says, To increase efficiency, design parameters related to

02:45:22 11    intersections and points of contact or connection between

02:45:25 12    components are included as design parameters.  That's not

02:45:29 13    saying included in the prior art as design parameters.

02:45:32 14    That's talking about what they're going to do in this

02:45:34 15    patent.

02:45:34 16              And if there was any doubt about that, the

02:45:37 17    declarations that address it show that people weren't doing

02:45:41 18    this.  No one has ever found in the prior art, let alone

02:45:44 19    something that's conventional, where a human operator was

02:45:47 20    programming a manufacturing machine to use parameters that

02:45:53 21    fully defined an intersection point.  I mean, they weren't

02:45:56 22    and the evidence, the only evidence before this Court

02:45:59 23    establishes it.

02:46:00 24              Now, I understand one might read this.  It's not

02:46:03 25    a lengthy patent.  The first version was in Italian,

02:46:06  1    whatever, but it says what it says.  And it does not say

02:46:09  2    that intersection parameters were being identified or

02:46:14  3    included in CAD models.

02:46:16  4              And, in fact, when Peddinghaus in this courtroom

02:46:18  5    today said to Your Honor, Look, it says the model includes

02:46:21  6    the intersection parameters, they're pointing to the

02:46:24  7    specification talking about the invention, not the

02:46:28  8    background.  Because what happens with the invention is you

02:46:32  9    can get intersection parameters that fully define an

02:46:36 10    intersection and put it into the model.  And, in fact, the

02:46:39 11    invention does that, at least in some instances.  But that's

02:46:45 12    the invention.  That's not conventional.

02:46:47 13              THE COURT:  So, actually, you keep saying the

02:46:49 14    invention does this, the invention does that.  What is the

02:46:51 15    invention?

02:46:52 16              MR. LOWRIE:  Okay.  So if I could, Your Honor --

02:47:03 17    if I could, Your Honor, I would say that I would rather

02:47:07 18    answer what's the idea --

02:47:09 19              THE COURT:  Okay.

02:47:10 20              MR. LOWRIE:  -- for the Alice context.  And to

02:47:12 21    do that, I'd like to kind of start with what happened before

02:47:17 22    the patent.  And what happened before the patent --

02:47:19 23              THE COURT:  Well, before you start doing that,

02:47:22 24    because it's helpful for me to understand where you're going

02:47:25 25    to end up, is tell me what the invention idea is and then

02:47:32  1    you can go back and give me the history.  Okay?

02:47:34  2              MR. LOWRIE:  Okay.  Then, I guess what I would

02:47:40  3    do is go to -- so, the way that I look at how to define the

02:47:46  4    idea starts really at Slide 18 which is just what are the

02:47:49  5    cases, and Your Honor asked for the best case.

02:47:51  6              THE COURT:  Well --

02:47:52  7              MR. LOWRIE:  But basically it's real world

02:47:55  8    versus not real world is what I'm trying to show on that

02:47:57  9    slide.  So, now I'll talk about the idea.

02:47:59 10              The idea in Peddinghaus' opening brief, as Your

02:48:02 11    Honor noted, was identifying --

02:48:03 12              THE COURT:  No, no.  Don't talk about

02:48:05 13    Peddinghaus.  You're the inventor.  It's your patent.  You

02:48:10 14    tell me what your characterization of the idea is.

02:48:15 15              MR. LOWRIE:  So, I would look, Your Honor, at

02:48:18 16    Slide 21.  Okay.  So, creating a CAD model of a

02:48:34 17    multi-component object.  The building is an example.  The

02:48:37 18    claim doesn't say that.  The setting and the context of

02:48:41 19    this, that is what it's -- and probably the background

02:48:47 20    talking about an assembly site for manufacturing.  We're not

02:48:50 21    talking about little bitty things, but it's the creating of

02:48:54 22    a CAD model for a multi-component object, and when

02:48:58 23    manufacturing one component of the multi-component object.

02:49:00 24    So, one beam, for example, but just an example.  Using the

02:49:04 25    CAD model to, and then I put derive in asterisks here.  I'll

02:49:08  1    say why in a second.  And then extract the intersection

02:49:10  2    parameters which define the intersection of that component

02:49:13  3    with a component that isn't being manufactured yet.  Right.

02:49:17  4              So, the idea is you're making an I-beam, but

02:49:22  5    you're not just making that I-beam.  You're looking at

02:49:24  6    things that you aren't even or may not even be making now,

02:49:27  7    and you're using those things to also manufacture this piece

02:49:31  8    in front of you.

02:49:32  9              And that's something that wasn't done before.

02:49:36 10    And then after that, the automated manufacture of the

02:49:40 11    component in a way it wasn't done before.  So, if Your Honor

02:49:43 12    wants to know what the prior art was, it was taking a 2D

02:49:47 13    printout, you know, like the big set of construction plans,

02:49:49 14    getting out your ruler, your tape measure and the soapstone.

02:49:53 15    That is not the setting of this.

02:49:54 16              THE COURT:  So, skip the prior art for the time

02:49:57 17    being.  The derivation, the deriving of intersection

02:50:06 18    parameters, is the reason you've asterisked derive is

02:50:10 19    because that's not a word I'm going to find in the patent

02:50:13 20    anywhere?

02:50:14 21              MR. LOWRIE:  Yes, and more.  So, on Slide 22, it

02:50:19 22    talks about -- the second bullet, it says deriving or

02:50:23 23    identifying intersection parameters.  So, the thing is

02:50:25 24    before the patent, there weren't CAD models that had the

02:50:30 25    intersection parameters to define the intersection in the

02:50:35 1    model as such, and so, you couldn't locate them in there.

02:50:39 2    You had to derive them.

02:50:41 3              After the invention, the CAD design modelers

02:50:43 4    looked at this thing and said what a great idea, or they

02:50:47 5    were demanded by people in the field building buildings or

02:50:51 6    beams for buildings and said, We want the intersection

02:50:54 7    parameters scribed, outlined, whatever onto the beams.

02:50:59 8              And if Your Honor thinks about it, this is

02:51:02 9    obviousness and anticipation maybe rather than patent

02:51:05 10   eligibility.  But it is a pretty cool idea to think I'm

02:51:08 11   going to make this steel beam, but I'm not going to just

02:51:12 12   look at the steel beam when I make it.  I'm going to look at

02:51:15 13   this other one that connects to it, and I'm going to use

02:51:18 14   that when I'm making this one.

02:51:19 15             And that was not conventional.  There is not an

02:51:24 16   iota of evidence to say that was conventional or known.  And

02:51:26 17   after --

02:51:26 18             THE COURT:  And, so, two things.  One of which

02:51:28 19   is what you just said, is there any place in the

02:51:34 20   specification where I would find that?

02:51:37 21             MR. LOWRIE:  No.  The specification, in fact,

02:51:41 22   doesn't even have to describe the prior art.

02:51:43 23             THE COURT:  Okay.  Well --

02:51:44 24             MR. LOWRIE:  You can infer it.

02:51:46 25             THE COURT:  Wait, wait.

02:51:48  1          MR. LOWRIE:  I mean, the claims would be the

02:51:50  2   short answer.

02:51:50  3          THE COURT:  Well, okay.  So, where in the claims

02:51:53  4   does it talk about deriving -- okay.  So, there's a line,

02:52:01  5   "wherein the processor extracts from the design model the

02:52:04  6   intersection parameters."

02:52:07  7          MR. LOWRIE:  Right.

02:52:07  8          THE COURT:  Is that basically it?

02:52:10  9          MR. LOWRIE:  Yes, but it gets -- it ripples

02:52:14 10   throughout the entire system, because if Your Honor looks,

02:52:18 11   it says, while it extracts the dimensions, that's in there,

02:52:22 12   the dimensions of the component you're looking at, it then

02:52:25 13   has to identify the intersection parts.  That wasn't done

02:52:29 14   before, so you have to -- you don't just extract those, you

02:52:32 15   identify them.  Then you extract them.  Then you transmit

02:52:36 16   them.  Also, not done before.  And then you use a

02:52:40 17   manufacturing machine to construct the piece.  An example

02:52:45 18   being an outline of how they intersect using the

02:52:48 19   intersection parameters that define the intersection.

02:52:50 20          And so, all of those things are defining this

02:52:53 21   invention.  None of those things existed in the prior art.

02:52:58 22   All of those things, for the most part, exist in the real

02:53:02 23   world, including the physical component that gets built

02:53:06 24   based on intersection parameters.  Something that not only

02:53:10 25   wasn't conventional, it wasn't known, as near as I can tell

02:53:14 1   having been through two litigations and an IPR.  I have yet

02:53:17 2   to see that prior art.

02:53:19 3          So, this was a big deal, which is why when

02:53:22 4   something comes out in the -- you know, I don't want to say

02:53:28 5   the genus of it, because that wasn't the word for it, the

02:53:31 6   breakthrough.  The breakthrough here was the intersection

02:53:33 7   parameter piece.  And when you write a patent claim, you

02:53:35 8   don't have to say this is the breakthrough in the claim, but

02:53:38 9   you do need a patentable claim.  And this one is as tied to

02:53:42 10  the real world and more than the Federal Circuit cases that

02:53:48 11  find patent eligibility and is easily distinguished from

02:53:51 12  those that don't.

02:53:52 13         And so, if we look at, a very quick look at

02:53:56 14  Slide 18, I kind of --

02:53:58 15         THE COURT:  Wait, wait.  Hold on a second.

02:54:00 16         MR. LOWRIE:  Yes, sir.

02:54:19 17         THE COURT:  So, one other thing, just while

02:54:21 18  we're on Page 21, you've got in italics that it defines the

02:54:29 19  intersection of a component that is not yet being

02:54:32 20  manufactured.  Is that somewhere in this claim?

02:54:36 21         MR. LOWRIE:  Yes.  It's in the fact that you've

02:54:43 22  got an object with multiple components that intersect, which

02:54:51 23  is the first limitation of the claim.  This whole claim is

02:54:55 24  directed to a physical system building, a physical product

02:54:58 25  using this thing reflected in almost every element of the

02:55:03 1   claim of that physical thing in the system.

02:55:04 2              THE COURT:  So, the component -- explain to me

02:55:10 3   again how what you just said is some type of indication that

02:55:23 4   this applies to intersection parameters of a component with

02:55:32 5   a component that has not yet been manufactured.  Is that

02:55:35 6   because you're just talking about drawings here?

02:55:37 7              MR. LOWRIE:  No, it's because we're talking

02:55:39 8   about -- I mean, maybe it's with an understanding of this

02:55:42 9   happens in the art, but when you make -- when you have the

02:55:45 10  assembly line, such as referred to in the patent or whatnot,

02:55:48 11  you have a component being made.  And then you make the next

02:55:51 12  component, and then you make the next component.

02:55:53 13             And what's different here is that when you're

02:55:55 14  making this component, you're not making this component just

02:55:57 15  on what this component is.  You're making it with how it

02:56:01 16  intersects with some component that's either already been

02:56:04 17  made, or hasn't been made yet, or somewhere else on that

02:56:07 18  line or maybe is made by another company.  But you're

02:56:10 19  taking -- because you don't know, when you're looking at the

02:56:13 20  CAD drawing for one thing, where it's going to go.  So, you

02:56:15 21  have a CAD drawing, multiple components of an object.

02:56:19 22  You're making one of the pieces -- well, or at least one of

02:56:23 23  the pieces using not just the shape and whatnot of that

02:56:27 24  piece, but with how it intersects with another piece as

02:56:31 25  determined by the CAD drawing, right, which in the prior art

02:56:38  1    didn't include the intersection parameters, at least not

02:56:40  2    sufficient to define an intersection.  And in the patent and

02:56:44  3    after the patent, they may because they learned it from

02:56:47  4    Ficep.

02:57:00  5              THE COURT:  All right.

02:57:01  6              MR. LOWRIE:  Okay.  So, kind of back to the -- I

02:57:04  7    would just -- a couple more things, in addition to whatever

02:57:08  8    Your Honor wants.  One is on Slide 18.  I look at kind of

02:57:12  9    the Supreme Court and Federal Circuit case law.

02:57:16 10              THE COURT:  Oh, right.  You were going to tell

02:57:18 11    me your best case.

02:57:19 12              MR. LOWRIE:  Yes.  Yeah.  Well, I've got a

02:57:21 13    bunch.

02:57:21 14              THE COURT:  Yeah, I would just prefer one.

02:57:24 15              MR. LOWRIE:  Okay.  If I had to pick one, and

02:57:26 16    I'm talking only about step one of Alice as opposed to

02:57:31 17    step two, I'd have to say Diamond Diehr from the Supreme

02:57:36 18    Court.  Math used in the known process to cure rubber.

02:57:39 19    Patent eligible because it's in the real world.

02:57:42 20              I would like to put in Ecoservices from the

02:57:46 21    Federal Circuit.  Automated washing of jets, something

02:57:50 22    that -- washing of jets had been done.  Automated washing,

02:57:52 23    patent eligible because it's in the real world and avoids

02:57:56 24    human errors.

02:57:57 25              Ficep also avoids human errors, but and more,

02:58:01  1   because the same thing wasn't being done.

02:58:03  2           THE COURT:  All right.  I'm familiar with the

02:58:06  3   Ecoservices case.

02:58:07  4           MR. LOWRIE:  Yeah.  And I would say that if one

02:58:09  5   looks at the cases that Peddinghaus identifies, Yu, it uses

02:58:14  6   one image to enhance another.  Nothing happens in the real

02:58:16  7   world.

02:58:18  8           University of Florida Research Foundation, you

02:58:20  9   take conventional bedside data, changes to format and

02:58:23 10   display it.  Nothing happens in the real world.

02:58:25 11           *Diamond vs. Diehr*, you're curing rubber.  Ficep,

02:58:29 12   you're making something.  You're making a component of a

02:58:32 13   larger structure, object, whatever one wants to call it.

02:58:36 14   It's in the real world.  There's something that exists after

02:58:38 15   you're done, but performing that, that didn't exist before

02:58:41 16   you performed that.  And the difference is not just showing

02:58:48 17   a heartbeat or whatnot.  It's building something, and that

02:58:52 18   is routed in the real world, which is not abstract under the

02:58:55 19   case law as it's developed.

02:58:57 20           THE COURT:  Do you have some other case for

02:59:03 21   inventive concept?

02:59:04 22           MR. LOWRIE:  For inventive concept?  If I could

02:59:09 23   just have one moment, please, Your Honor.

02:59:19 24           So, I'm not sure I have it in my slides, but I

02:59:22 25   think it's any of the cases.  I think Berkheimer is one of

02:59:26  1    them that says basically if there's a dispute over what's

02:59:31  2    conventional, it's for the jury.  It's a fact dispute.

02:59:35  3            And if Your Honor looks at Slide 29, I think

02:59:40  4    that there is no genuine dispute that all of the things on

02:59:44  5    Slide 29 are not conventional, and they're all reflected in

02:59:48  6    the claim.

02:59:50  7            So, a CAD design generally, sure.  Identifying

02:59:54  8    parameters that define an intersection, no.  Transmitting

03:00:00  9    that to a manufacturing machine, whether by human or

03:00:03 10    otherwise, no.

03:00:03 11            I said automated manufacture of a part based on

03:00:06 12    an intersection with a different part.  We talked about

03:00:09 13    that, but Your Honor can get rid of the word automated.

03:00:12 14    Manufacturing based on the intersection with a different

03:00:15 15    part is not something in the prior art, either, unless Your

03:00:19 16    Honor counts taking a soapstone and drawing on it as

03:00:23 17    manufacturing using manufacturing equipment.  I don't think

03:00:27 18    the soapstone is.  And without that, this is another thing

03:00:30 19    that's not conventional and not in the prior art.

03:00:32 20            So, honestly, given the lack of evidence from

03:00:37 21    Peddinghaus, I don't think they've created a genuine dispute

03:00:40 22    that this claim passes step two because there's no reason to

03:00:46 23    conclude it's conventional.  You know, Peddinghaus comes in

03:00:49 24    and says, Well, they don't actually prove that the process

03:00:53 25    is different than the guy marking it, printing it out.  You

03:00:57 1   know, he might have images of the fact that this thing is

03:00:58 2   out here and going like this, and that's not what the

03:01:01 3   computer is going to do with the CAD drawing.  We don't --

03:01:03 4   Your Honor doesn't need evidence to know that.

03:01:05 5           But the more important point is Peddinghaus has

03:01:08 6   the burden of proof by clear and convincing evidence.  Your

03:01:11 7   Honor has proof that they didn't -- that it's not met.

03:01:15 8   Don't even -- Your Honor knows the standard much better than

03:01:18 9   I do by a long shot, I know this, but they didn't even

03:01:20 10  purport to carry their burden to show that it's the same.

03:01:25 11          And so, Your Honor has to reach the conclusion,

03:01:28 12  not that it's not the same, but that they haven't proved

03:01:30 13  that it is.  And, therefore, it passes step two.

03:01:35 14          THE COURT:  All right.  Anything else?

03:01:38 15          MR. LOWRIE:  No.  In terms of the technological

03:01:47 16  part, I would, again, refer to the industry recognition

03:01:51 17  calling a breakthrough the fact that once people saw this,

03:01:53 18  they copied it.  If this was merely conventional, merely

03:01:56 19  automating, why was Ficep the first one to do it, followed

03:01:59 20  by everybody copying them right away?

03:02:01 21          Commercial success is in 90 percent of the

03:02:04 22  machines Ficep sells.  This is all the evidence before your

03:02:07 23  Court -- before the Court.  None of which is either

03:02:10 24  impeached or rebutted.

03:02:12 25          And, of course, I'm happy to take any more

03:02:16  1    questions.

03:02:17  2                    THE COURT:  Okay.  Thank you, Mr. Lowrie.

03:02:23  3                    Okay.  Ms. Koh, briefly.

03:02:25  4            MS. KOH:  Yes, Your Honor.  Just a few points.

03:02:33  5                    Mr. Lowrie said that a hole does not define an

03:02:37  6    intersection.  We looked at the patent which talks about

03:02:40  7    bolt fixing points as an intersection parameter.  A hole

03:02:43  8    definitely does define an intersection.

03:02:45  9                    Your Honor's also right that nothing about the

03:02:48 10    claims in this patent are directed to big steel buildings.

03:02:50 11    The patent actually gives a shed as an example of something

03:02:53 12    that could be manufactured.  It's not a big steel building.

03:02:57 13                    And Your Honor is also correct that any

03:02:59 14    multi-component object has intersections and intersection

03:03:01 15    parameters, and many multi-component objects are created

03:03:05 16    using CAD models.  Ficep makes a lot of the fact that we're

03:03:09 17    in the real world, that there's a real-world machine.  But

03:03:12 18    here those limitations in the real world are directed --

03:03:15 19    they're just post-solution activities that occur after the

03:03:18 20    alleged invention of automating and transferring data.

03:03:22 21            THE COURT:  So, what are you referring to there?

03:03:25 22    I mean, I understand the post-solution language from cases.

03:03:30 23    What is it that you're saying is the post-solution activity

03:03:33 24    here?

03:03:34 25                    MS. KOH:  The manufacturing step.  It's not --

03:03:36 1    the claims aren't directed to a brand new manufacturing

03:03:39 2    machine or an inventive manufacturing process.  It's just

03:03:44 3    the environment in which this automation takes place.

03:03:48 4              THE COURT:  Yeah.  Hold on a second.

03:03:50 5              MS. KOH:  Sure.

03:04:12 6              THE COURT:  So, the thing that Mr. Lowrie put up

03:04:13 7    in Figure 2 from the patent, would that be possibly an

03:04:25 8    embodiment of the thing that's claimed in claim 7?

03:04:32 9              MS. KOH:  So, it's possibly an embodiment.  The

03:04:36 10   specification never describes that machine as a scribing

03:04:41 11   tool or as anything unique or different.

03:04:44 12             THE COURT:  Well, when you're talking about what

03:04:46 13   it's described as, you know, so I'm looking at the detailed

03:04:55 14   description of embodiments.  Figure 2 is a block diagram

03:05:01 15   depicting a system.  That's Column 5.

03:05:09 16             I mean, it's a system.  It may not be much

03:05:15 17   different than the -- so, the Figure 2 has a computer.  It

03:05:26 18   has a box with some stuff in it, and then it has this

03:05:30 19   machine, 235.

03:05:36 20             Do you think -- well, let me first off, just

03:05:41 21   hold there.

03:05:42 22             So, Mr. Lowrie, is some part of Figure 2 an

03:05:47 23   embodiment of claim 7?  And if so, what part?

03:05:50 24             MR. LOWRIE:  So, I believe -- do I need to be up

03:05:54 25   there?

03:05:55   1          THE COURT:  No, no, no.

03:05:56   2          MR. LOWRIE:  So, I believe that Figure 2 shows a

03:05:58   3   computer which can be used to handle the CAD drawings.  And

03:06:03   4   it shows a scribing machine.  And the evidence before Your

03:06:10   5   Honor, the declarations show one of ordinary skill in the

03:06:13   6   art would recognize it.  That's a scribing machine.

03:06:15   7          I think there are more things in the claim

03:06:17   8   actually than just that.

03:06:18   9          THE COURT:  No, no, no.  I understand that

03:06:20  10   embodiments are --

03:06:21  11          MR. LOWRIE:  No, no, no, no, Your Honor.  That's

03:06:23  12   not what I meant.  So, I believe the claim talks about

03:06:26  13   extracting dimensions and using those.

03:06:29  14          And so, for example, in the system that I had up

03:06:32  15   earlier, there was a saw that would cut based on dimensions.

03:06:38  16   That's a part of the claim that we haven't talked about

03:06:40  17   because it doesn't use intersection parameters, but it is in

03:06:43  18   the claim.  The parts of the claim that talk about

03:06:46  19   manufacturing using intersection parameters, if Your Honor

03:06:49  20   looked at the infringement --

03:06:50  21          THE COURT:  Well, so --

03:06:51  22          MR. LOWRIE:  -- it's the scribing machine.

03:06:52  23          THE COURT:  So, wait.  So, is the thing that's

03:06:56  24   depicted in Figure 2 an embodiment of claim 7 or not?

03:07:02  25          MR. LOWRIE:  It's some of the pieces that are in

03:07:04  1    claim 7.   There are other pieces that can be added.

03:07:07  2              THE COURT:  So, it's not an embodiment by

03:07:10  3    itself?

03:07:11  4              MR. LOWRIE:  Could I just have a minute, Your

03:07:15  5    Honor?

03:07:15  6              THE COURT:  Yeah, yeah, yeah.

03:07:29  7              MR. LOWRIE:  I apologize, Your Honor.  I believe

03:07:31  8    that the claim would cover that, what's shown in Figure 2.

03:07:34  9              THE COURT:  Okay.

03:07:36  10             MR. LOWRIE:  And, of course, you could add

03:07:37  11   things, but I believe that everything that one would need

03:07:39  12   for claim 7 can be found in Figure 2.

03:07:42  13             THE COURT:  All right.  Thank you.

03:07:44  14             Ms. Koh, I'm sorry.  I interrupted you.

03:07:46  15             MS. KOH:  No problem, Your Honor.  I was just

03:07:48  16   going to point out we collected some of the quotes on our

03:07:52  17   Slide 12.  That manufacturing machine, as Your Honor pointed

03:07:55  18   out, is described quite broadly in the specification.  It's

03:08:00  19   not limited to any particular kind of manufacturing machine

03:08:03  20   at all.

03:08:04  21             Your Honor asked whether the patent says that

03:08:09  22   there's something different about intersection parameters,

03:08:13  23   whether there's something different about the design models

03:08:16  24   and whether the intersections were or were not part of the

03:08:21  25   preexisting design models.  So, I wanted to briefly touch

03:08:26  1    back on that point.

03:08:29  2         We collected a variety of quotes on this point

03:08:39  3    on our Slide 5, but the patent repeatedly explains that

03:08:44  4    intersection parameters are part of the design model.  So,

03:08:48  5    if you look, for example, at Column 6 starting at Line 28,

03:08:55  6    this is in a paragraph that's describing the computer-aided

03:08:58  7    design model.  It says, The components are generally in

03:09:00  8    contact with other components, and the components are in

03:09:03  9    contact with each other at the intersection points in a

03:09:07 10    specific manner.  The design model typically includes

03:09:11 11    specification and tolerance levels related to the points of

03:09:14 12    intersection between components.

03:09:16 13         And at the bottom of Column 6, starting at

03:09:21 14    Line 63, again, it says, Typically all of the specifications

03:09:24 15    associated with points of intersection between components,

03:09:28 16    such as male-female joint between two components, are

03:09:31 17    included as part of the design model in order to allow

03:09:34 18    complete manufacture and or assembly of the object or of its

03:09:34 19    components.

03:09:39 20         And in its claim construction brief, which is

03:09:43 21    Docket 74, at Footnote 10, Ficep says that the specification

03:09:50 22    itself indicates that the same design models used in the

03:09:54 23    manual prior art process are also used in the automatic

03:09:58 24    claimed process.  So, Ficep has said these portions that

03:10:01 25    talk about the design model in Column 6, we somehow have to

03:10:05 1    discount in the 101 analysis because they're not in the

03:10:09 2    Background of the Invention section.  But Ficep itself has

03:10:12 3    said that the same design models are used in the manual

03:10:16 4    prior art process and in the automatic claimed process.

03:10:19 5            So, these portions of Figure 6 are not

03:10:21 6    describing some new CAD model.  They didn't cover a new CAD

03:10:25 7    model.

03:10:25 8            THE COURT:  No, I don't think that they're

03:10:27 9    claiming that they have a new CAD model.  Am I right?

03:10:30 10           MS. KOH:  Well, they claim that they were the

03:10:32 11   first to put intersection parameters into the model or to

03:10:34 12   derive the intersection parameters.  And this is making

03:10:37 13   clear in those portions that I just cited from Column 6 that

03:10:41 14   the intersection parameters, the specifications, the

03:10:43 15   tolerances relating to the intersections were all part of

03:10:46 16   the conventional CAD models.

03:10:55 17           THE COURT:  Okay.

03:10:56 18           MS. KOH:  Their patent isn't directed to some

03:10:59 19   new type of information that was never before in the model.

03:11:04 20           Your Honor also asked what their invention was

03:11:07 21   or what the idea of their invention was, and I would direct

03:11:10 22   Your Honor to Page 2 of Ficep's opposition brief at Docket

03:11:15 23   53.  There they stated that the patented invention relates

03:11:19 24   to the analysis of electronic versions of construction

03:11:23 25   plans, such as computer-aided design files and files created

03:11:28  1    by modeling software to direct manufacturing equipment to

03:11:31  2    perform manufacturing steps on steel beams or other

03:11:34  3    components of the building.  That's what their invention is

03:11:37  4    directed to.

03:11:37  5              THE COURT:  Wait, wait, wait.  Hold on a minute.

03:11:45  6              Yeah, I'm sorry.  What is your point here?

03:11:48  7         MS. KOH:  That their invention is not what we've

03:11:50  8    looked at in their slides about deriving or manufacturing

03:11:57  9    one part based on information on another part that's not

03:12:02 10    being manufactured.  They've stated elsewhere that their

03:12:04 11    invention relates to the analysis of electronic versions of

03:12:07 12    construction plans.

03:12:08 13              THE COURT:  Well, you know, saying something

03:12:10 14    relates to something is not the same thing as saying it is.

03:12:16 15    I mean, I guess I understand what you're saying, but I'm not

03:12:20 16    so sure that picking sentences here or there and saying, ah

03:12:29 17    ha is the strongest argument you have.

03:12:38 18              But, in any event, what else?

03:12:39 19         MS. KOH:  Your Honor, we also heard a lot about

03:12:41 20    various steps in the claim that had never been done before,

03:12:45 21    and I think it's important to think about what is really

03:12:48 22    being said there.  I think that the point is they've never

03:12:51 23    been done before on a computer.  They were indisputably done

03:12:57 24    before by human operators that passed this data.  What was

03:12:59 25    never done before is just the automation of the process.

03:13:03 1          That's what the claims are focused on.  Those
03:13:05 2   are the various steps that have never been done before.
03:13:08 3   They were done before by humans.  Ficep's argument is they
03:13:12 4   haven't been done before by a computer, and all the claims
03:13:15 5   add is a generic computer with no details at all about how
03:13:18 6   it operates.
03:13:19 7          And, finally, Your Honor, Ficep's assertion that
03:13:22 8   a component, until this patent, had never been manufactured
03:13:26 9   based on information about a different component in the
03:13:30 10  design model doesn't make sense.  If you're cutting a bolt
03:13:34 11  hole in one part based on where two parts are going to
03:13:37 12  connect, you have made one part based on information about
03:13:42 13  another.  This was not -- Ficep was not the first to come up
03:13:45 14  with the idea of manufacturing one part based on how it's
03:13:49 15  going to fit into a larger object.
03:13:51 16         So, unless Your Honor has any other questions,
03:13:55 17  I'll stop there.
03:13:56 18         THE COURT:  I don't think so.  Thank you.
03:13:58 19         MS. KOH:  Thank you.
03:13:59 20         THE COURT:  Okay.  So, let me just take a recess
03:14:05 21  for like two minutes, and I'll be back.
03:14:13 22         DEPUTY CLERK:  All rise.
03:22:35 23         (Recess was taken.)
03:22:37 24         DEPUTY CLERK:  All rise.
03:22:42 25         THE COURT:  All right.  Please be seated.

03:22:44  1                  So, I'm going to take this under advisement, and

03:22:52  2     I will get back to you.  Thank you for your time this

03:22:54  3     afternoon and have a nice day.  We're through.

03:23:01  4                  DEPUTY CLERK:  All rise.

5                  (Court was recessed at 3:23 p.m.)

6                  I hereby certify the foregoing is a true and

7     accurate transcript from my stenographic notes in the

8     proceeding.

9                  /s/ Heather M. Triozzi
                   Certified Merit and Real-Time Reporter
10                 U.S. District Court

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25